## MILLER v. TEXAS AND PACIFIC RAILWAY COMPANY.

## WORRALL v. TEXAS AND PACIFIC RAILWAY COMPANY.

## DUNLAP v. TEXAS AND PACIFIC RAILWAY COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS.

Nos. 737, 867, 868. Submitted January 2, 1889. — Decided January 6, 1890.

R., a citizen of Texas, made his will there June 7, 1848, by which he devised all his property, including the real estate in controversy, (1) to his wife for twenty-one years after his death; (2) after that to his offspring, child or children by his said wife; (3) in the event of the death of his wife without offspring by him, to the children of M. by M'.s then wife, who was a sister of R.'s wife; (4) in the event of the death of the offspring which he might have by his wife, to his wife for life. M. was named as executor of the will. R. died January 10, 1850, leaving surviving his wife and an infant son. This son was born after the making of the will and died in 1854. The will was duly proved by the executor shortly after R.'s death. About six months after R.'s death his widow married F., by whom she had several children. Two years after the probate of the will F. and his wife commenced proceedings to have the will declared null and void on the ground that the property was communal property. In these proceedings the executor was defendant, and a guardian *ad litem* was appointed for the infant, and such proceedings were had therein that in October, 1852, a decree was entered, declaring the will to be null and void, and setting it aside; *Held*,

(1) That the devise to the children of M. was a contingent remainder, to vest only in case of the death of the testator's wife without offspring by him, and limited after the fee which was primarily given to the testator's child;

(2) That, the executor being a defendant and appearing and answering, and the infant son being represented by a guardian *ad litem*, and the executor being interested on behalf of his own children that the will should stand, (if that was of any consequence,) all the necessary parties were before the court to sustain the decree;

(3) That the decree could not be attacked collaterally, and was binding on the children of M.

*McArthur* v. *Scott*, 113 U. S. 340, distinguished from this case.

A contingent interest in real estate or an executory devise is bound by ju-

dicial proceedings affecting the real estate, where the court has before it all parties that can be brought before it in whom the present estate of inheritance is vested, and the court acts upon the property, according to the rights that appear, without fraud.

In Texas an equitable claim of title to real estate is equally available with a legal one.

In Texas, the holder of a head-right certificate could locate it upon a tract of public land, and then abandon the location and locate it upon another tract, and, in such case the abandoned tract became thereby again public land, subject to location by other parties.

From the evidence it would appear that the Rutledge certificate which is in controversy in this case was in the land office in Texas on or before August 1, 1857, in compliance with the requirements of the act of the Legislature of Texas of August 1, 1856. 1 Paschal's Digest, 701, art. 4210.

By the act of the legislature of Texas of April 25, 1871, 2 Paschal's Digest, 1453, arts. 7096–7099, it was provided that a certificate of location and survey of public lands, not on file at the passage of that act, and not withdrawn for locating an unlocated balance, should be returned to and filed in the office within eight months thereafter, or the location and survey should be void; *Held*, that in the absence of clear proof that a valid located certificate was not on file there within the statutory time, the court would not raise such a presumption in favor of another title, superposed upon the land at a time when the certificate was valid and possession was enjoyed under it.

The practice of locating land certificates upon prior rightful locations is not favored by the laws of Texas.

The failure of the holder of a head-right certificate in Texas to complete his title, by complying with statutory provisions in regard to the filing of his certificate, enures to the benefit of the State alone.

In Texas the rights of a subsequent locator, having actual notice of a prior location, are postponed to the superior rights of the prior locator, although the subsequent location may have passed into a patent.

The provisions in the constitution and laws of Texas respecting the location of land certificates, reviewed.

In Texas land certificates are chattels, and may be sold by parol agreement and delivery, the purchaser and grantee thereby acquiring the right to locate a certificate and to take out a patent in his own name and to his own use.

The failure, in a certificate of acknowledgment of a deed of the separate property of a married woman in Texas, to state that she was examined apart from her husband, cannot be supplied by proof that such was the fact.

In Texas an habendum to a deed running "to have and to hold to him the said" grantee, "his heirs and assigns forever, free from the just claim or claims of any and all persons whomsoever, claiming or to claim the same," imports a general warranty and estops the grantor and his heirs from setting up an adverse title against the grantee.

On the facts the court holds that the statute of limitations of Texas is a complete bar to the claims set up by the complainants, both in the original bill and in the cross-bills.

In EQUITY. The suit, as it was commenced in a state court in Texas, was an action of trespass; but, on its removal to the Circuit Court of the United States, a repleader took place on the equity side of the court. The original bill and the cross-bills were dismissed, from which decree this appeal was taken. The case is stated in the opinion.

*Mr. F. G. Morris* for Miller and others, appellants.

*Mr. J. M. Morphis* for Worrall and others, appellants.

*Mr. Sawnie Robertson* for William Dunlap, Virlinda M. Tilney, joined with her husband, R. P. Tilney, John Graham, Mary C. Cook and John Cook by his next friend Mary C. Cook, appellants in No. 868, and appellees in 737, and 867.

*Mr. A. S. Lathrop* for the Texas and Pacific Railway Company, appellee.

Mr. JUSTICE BRADLEY delivered the opinion of the court.

This suit was originally an action of trespass to try title, brought in March, 1884, in the District Court of Tarrant County, Texas, by William L. Foster and his children, William D. Foster and others, against Elizabeth J. Daggett and her husband, E. B. Daggett, and The Texas and Pacific Railway Company, The Missouri Pacific Railway Company, The Fort Worth and Denver Railway Company and The Gulf, Colorado and Santa Fé Railway Company, to recover possession of 320 acres of land in the city of Fort Worth. Much of the land in question is laid out in streets and covered with buildings, and nearly 100 acres of it is occupied by the said railroad companies, or some of them, for their tracks, station houses, freight depots, shops, etc. The plaintiffs claimed title as heirs at law of one Thomas P. Rutledge, through Eliza A. Foster, wife of William L. Foster, and mother of the other plaintiffs, who had been the wife and widow of said Rutledge, and mother of his only son, deceased. The defendants filed answers, claiming the lands under an alleged purchase from Rutledge of his head-right certificate under which the lands were located, and also under an independent title derived by purchase from the heirs

of one John Childress; and also by long and undisturbed possession. No patent for the lands had ever been granted on the Rutledge title, which was older than the Childress title; but a patent was granted on the latter in June, 1868: so that the various claims under the Rutledge title were of an equitable character, which, in the Texas jurisprudence, is equally available with the legal title.

In October, 1884, Thomas H. Miller and others, children of one Alsey S. Miller, intervened in the suit as plaintiffs, claiming the same land as devisees of Thomas P. Rutledge.

On the 20th of April, 1885, William Dunlap and others filed their petition in the suit, claiming one-half interest in the lands as heirs-at-law of Adaline S. Worrall, wife of one I. R. Worrall; and on the 23d of March, 1886, Martha R. Worrall and others intervened as plaintiffs, claiming the other half interest in the lands as heirs-at-law of said Adaline, through the said I. R. Worrall. The Dunlaps and the Worralls claim under the same right, and allege that Adaline S. Worrall became entitled to the lands by purchase from the heirs of John Childress, and that, on her dying without issue in 1870, her brothers and sisters, represented by William Dunlap and others, inherited one-half of her interest, and her husband, I. R. Worrall, represented by his mother, Martha R. Worrall, and others, inherited the other half.

In December, 1885, the original plaintiffs, William L. Foster and his children, took a non-suit, and were dismissed out of the case, leaving three sets of claimants to the land, to wit: (1) the original defendants, the Daggetts and the railroad companies, who were in possession, claiming under all the titles; (2) Thomas H. Miller and others, claiming as devisees of Thomas P. Rutledge; (3) the Dunlaps and the Worralls, claiming under John Childress, through Adaline S. Worrall.

In March term, 1886, the last set of claimants, William Dunlap and others, and Martha R. Worrall and others, who were citizens of other states than Texas, removed the proceedings into the Circuit Court of the United States for the Northern District of Texas; and in that court a repleader took place on the equity side of the court. Thomas H. Miller

and others, claiming as devisees of Rutledge, filed a bill to maintain their alleged equitable title to the land, and made the other parties defendants, who all filed answers; and the intervenors, Dunlap and others and Worrall and others, also filed separate cross-bills, to which the other parties filed answers. The court below dismissed both the original and cross-bills, and this appeal is brought from that decree.

The land in question, when the titles set up by the complainants originated in 1852 and 1868, was of small value; but having become the site of a portion of the city of Fort Worth, and of an important railroad centre, it has acquired a very great value, and is the subject of earnest litigation.

The Rutledge title originated under a head-right for 320 acres of land in Texas, granted in October, 1846, to Thomas P. Rutledge as an emigrant, by the board of land commissioners of Gonzales County, where he then resided. It is alleged by the defendants, and proof was adduced to show, that Rutledge sold this certificate to one Matthew Brinson in or about 1848, and that Brinson sold it to one M. T. Johnson in 1851. It was located by Johnson (in Rutledge's name) on the premises in dispute in 1851 or 1852, and a survey in pursuance of such location was made January 8, 1852, by A. J. Lee, deputy surveyor for the Robertson Land District. It had previously been located on lands in Fannin County, but the evidence shows (as we think) that that location was abandoned, and that the location on the lands in dispute took the place of it.

The following is the copy of the survey made by Lee, to wit:

" THE STATE OF TEXAS, *Robertson Land District:*

" I have surveyed for Thomas P. Rutledge 320 acres of land situated in Tarrant County, about ¾ of a mile S. E. from Fort Worth and 5½ miles S. 44 W. from Birdville, by virtue of his head-right certificate No. 134, class 3rd, issued by the board of land comm'rs for Gonzales County on the 12th day of October, 1846 —

" Beginning at the S. E. cor. of W. W. Warnell's 1280 sur.,

now in the name of R. Briggs, at a stake, whence a hackberry 2 in. di. brs. S. 67 E. 77 vs. and an elm 2 in. di. brs. N. 68 W. in the head of a hollow; thence west 1344 vs. to said War- nell's S. W. cor., a stake and mound in prairie; thence south 1344 vs. to a stake and mound in prairie; thence east 1344 vs. to a stake and mound in prairie; thence north 1344 vs. to the place of beginning.

"Surveyed the 8th day of January, 1852.

"A. J. LEE, *D. S. R. L. D.*,

"MERCER FAIN & T. I. JOHNSON, *Chainers.*"

This survey was duly recorded in the records of the land district and filed in the General Land Office of the State; but no patent was issued upon it.

The tract thus surveyed was an exact square of 1344 varas, or 1244½ yards on each side. One E. M. Daggett located another tract of 320 acres somewhere in the same neighbor- hood, and in the year 1853 or 1854 he made an exchange with Johnson for the lot in question, and in June, 1855, Johnson executed to Daggett a deed, of which the following is a copy to wit:

" THE STATE OF TEXAS, *County of Tarrant:*

" Know all men by these presents that I, M. T. Johnson, of the state and county aforesaid, for and in the consideration of the three hundred and twenty acre land certificate issued by the board of land commissioners of Shelby county, in the name of E. M. Daggett, class 3rd, and as deeded to me by said Daggett this day, I have bargained, sold, and aliened unto the aforesaid E. M. Daggett all and singular the head-right certifi- cate of T. P. Rutledge, and I warrant and defend the right and title of said head-right to his heirs or legal representa- tives free from myself and heirs, &c., and place E. M. Dag- gett forever in full ownership, the said head-right being located near Fort Worth, bounded on the east by a survey in the name of M. T. Johnson, a colony certificate, and on the west by a survey made of Jennings, and on the north by a survey in the name of Rebecca Briggs, all to be divested from me,

my heirs or any person claiming the same, and placing E. M. Daggett, his heirs or legal representatives, in full ownership of the same forever.

"Given under my hand and seal this 23d day of June, A.D. 1855.

"M. T. JOHNSON. [L. S.]

"Attest: JULIAN FIELD.
    "JOHN P. SMITH."

This deed was duly proved and recorded on the 30th day of March, 1857. Daggett, according to the weight of the testimony, went into possession of the land in 1854, prior to the date of the deed; built upon and improved it, and occupied it as his homestead, (with the exception of such portions as he sold or leased to other parties,) until his death April 19th, 1883. The defendants Elizabeth J. Daggett and her husband claim portions of the land under the will of said E. M. Daggett, and the railroad companies claim other portions as his grantees; and both allege that the possession of said E. M. Daggett and of themselves under him has been continuous for nearly thirty years prior to the commencement of the suit; namely, from the time when said Daggett first took possession of the land in 1854; and that such possession has been under a deed duly registered from the time the said deed was given by Johnson to Daggett.

T. H. Miller *et al.*, the complainants, deny that Rutledge ever sold his head-right certificate to Brinson, or any one else, and claim that its location on the land in question enured to the benefit of Rutledge alone, and to themselves as his devisees, under a will made by him on the 7th of June, 1848. That will is in evidence. By it, Rutledge devised, first, all his property to his wife, Eliza A. Rutledge, for twenty-one years after his death; and after giving some directions about certain specific personal property, devised as follows:

"Fifth. I direct that after the expiration of twenty-one years from and after my death, all of my estate, both real and personal, shall be owned and enjoyed by my offspring or child or children by my said wife. . . .

" Seventh. In the event of the death of my said wife without offspring by me at her death which may survive her, I direct that all of my estate, real and personal, shall be owned equally by the children of Alsey S. Miller which may survive me, which he may have by his present wife.

" Eighth. In the event of the death of the offspring which I may have by my said wife, I direct that my said wife shall have all of my estate, both real and personal, for and during her life. . . .

" Ninth. I do appoint the said Alsey S. Miller, of said county and state, my executor of this my last will and testament."

Rutledge died on the 10th of January, 1850, leaving surviving him his wife, Eliza A. Rutledge, and an infant son, William M. Rutledge, who was born after the making of the will, but who died in 1854, about six years of age. Eliza A. Rutledge, after her husband's death, married William L. Foster in July, 1850, by whom she had several children, and died in February, 1881.

The will was regularly proved in April, 1850, by Alsey S. Miller, the executor, whose wife was a sister of Eliza A. Rutledge, and whose children were the devisees in remainder named in the will. It will be seen that the said remainder was a contingent one, to vest only in case of the death of the testator's wife without offspring by him. It was also limited after the fee which was primarily given to the testator's child.

More than two years after the probate of the will, proceedings were instituted by William L. Foster and his wife Eliza A. Foster, in the District Court of Gonzales County, having the proper jurisdiction, to have the will declared null and void. Alsey S. Miller, the executor, was made defendant, and the court appointed S. B. Conley guardian ad litem for William M. Rutledge, the infant child of the testator. The petition for nullity of the will alleged that the property of the deceased was community property; that the will was made before the birth of the child; that the disposition made was contrary to law, and trammelled with illegal and embarrassing conditions. It further stated that the executor had faithfully performed

his trust, had paid all debts of the estate, and was ready to close it. The executor filed an answer, admitting the allegations of the petition, and not opposing its prayer. The guardian *ad litem* filed an answer, leaving the matter under the control of the court to act in its wise discretion as to justice should seem meet. The court thereupon made a decree as follows:

" Saturday, October 23d, 1852.

" Came all the parties by their att'ys, and S. B. Conley, Esq., guardian *ad litem* for the minor, W. M. Rutledge, and the matters and things being all before the court by the pleading and record evidence therein, the same was submitted to the court, and, being heard, it is ordered, adjudged, and decreed by the court that the will of the deceased, Thomas P. Rutledge, made on the 7th June, 1848, and admitted to probate on the 29th April, 1850, be, and the same is hereby, declared to be null, void, and of no effect, and that the same be in all things set aside and held for naught. It is further ordered, adjudged and decreed that the said Eliza Ann Foster, as relict of said Rutledge, deceased, and the said W. M. Rutledge, minor, be entitled to take, receive and hold all the property of said deceased jointly between them as heirs-at-law, be the same real, personal or mixed, and subject to the action of the county court of Gonzales County as to distribution after the debts are paid and estate closed by the report of the executor, whose acts under the will are not impaired by this decree, and that said court is required to make the yearly allowance to the said Eliza Ann Foster, in accordance with law and the order of said county court. It is further ordered and adjudged that the executor, out of the funds of the estate, pay the costs herein expended, and that this decree be duly certified to the county court for observance."

If this decree is valid, it disposes of the claim of the complainants, Thomas H. Miller and others, which is based on the devise of the will. The precise question came before the Supreme Court of Texas in the recent case of *Thomas H.*

*Miller et al.* v. *W. L. Foster et al.*, (not yet reported,) and was decided against the contention of the appellants, Miller *et al.* The Commission of Appeals held that the decree of nullity was valid, and that all the necessary parties were before the court when it was rendered. This decision was approved by the Supreme Court.

It is contended by appellants that the decision in the case of *MacArthur* v. *Scott*, 113 U. S. 340, is adverse to this view. But a careful examination of that case will show that this is not correct. The decree setting aside the will in that case was held not to be binding upon certain grandchildren of the testator, not born when it was passed, because their interests (which were executory) were supported by a legal trust estate in the executors, which was not represented in the proceedings. No trustee of that estate was made a party. The executors had resigned their office, and the court had accepted their resignation; and no new trustee had been appointed in their stead, as might have been done. There was no party in the case to represent the will, or the interests created by it, or the legal estate which supported those interests. This was the special ground on which the decision in *MacArthur* v. *Scott* was placed, as is fully expressed in the opinion.

In the present case the executor was a defendant in the proceedings instituted for avoiding the will, and appeared and filed an answer; and the infant son of Rutledge, who was devisee in fee of the whole estate after the termination of his mother's interest, was represented in the proceedings by a guardian *ad litem*. Moreover, if the circumstance is of any consequence, the executor was interested on behalf of his own children that the will should stand, — as they were the principal devisees in remainder. We think that the Supreme Court of Texas was right in holding that all the necessary parties were before the court. We are also of opinion that the decree avoiding the will cannot be attacked collaterally; and that it is binding on the appellants, Thomas H. Miller and others. The entire estate was represented before the court, — a particular estate in the widow, and the fee simple remainder in the infant son. The interest of the appellants, Thomas H.

Miller and others, as devisees under the will, was a mere contingent interest, a mere executory devise. In such a case it is sufficient to bind the estate in judicial proceedings to have before the court those in whom the present estate of inheritance is vested. Lord Redesdale's authority on this point is decisive. In *Giffard* v. *Hort*, 1 Sch. & Lef. 386, 408, he says: "Where all the parties are brought before the court that can be brought before it, and the court acts on the property according to the rights that appear, without fraud, its decision must of necessity be final and conclusive. It has been repeatedly determined that if there be tenant for life, remainder to his first son in tail, remainder over, and he is brought before the court before he has issue, the contingent remainder-men are barred." In another part of the same opinion Lord Redesdale said: "Courts of equity have determined on grounds of high expediency that it is sufficient to bring before the court the first tenant in tail in being, and if there be no tenant in tail in being, the first person entitled to the inheritance, and if no such person, then the tenant for life." Ib. ibid. These propositions are substantially repeated in his Treatise on Pleading, 173, 174, where he adds, "Contingent limitations and executory devises to persons not in being may in like manner be bound by a decree against a person claiming a vested estate of inheritance; but a person in being claiming under a limitation by way of executory devise, *not subject to any preceding vested estate of inheritance by which it may be defeated,* must be made a party to a bill affecting his rights." In the present case, it is true, some of the children of Alsey S. Miller were in being at the time of the proceedings in question (1852); but there was a "preceding vested estate of inheritance," by which their executory devise might be defeated, namely, the estate vested in the infant child of Thomas P. Rutledge, who was a party to the proceedings. We are of opinion that the bill of Thomas H. Miller and others was properly dismissed by the court below.

The complainants in the cross-bills, William Dunlap and others, and Martha R. Worrall and others, claim the lands under the other source of title, that of John Childress; and, to avoid the effect of the defendants' claim under the Rutledge

certificate, they deny that it was assigned by Rutledge to Brinson, or by Brinson to M. T. Johnson; deny that it was ever lawfully located on the land in question; and aver, that if it was ever properly located thereon, it became void by non-compliance with the land laws of Texas.

The Childress title arose in the following manner: John Childress, a brother-in-law of the late Mr. Justice Catron, and brought up in his family, was an early emigrant to Texas under the patronage of his uncle, Sterling C. Robertson, empressario of a colony on the Brazos River. His first visit to Texas was in 1834, and in 1836 he took his wife and two children with him, namely, John W. Childress and George R. Childress. Though numbered among the colonists of Mr. Robertson, for some reason he failed to obtain any valid grant of land, though undoubtedly entitled to one. He died in Texas in the fall of 1837. By an act of the legislature of Texas, passed February 13, 1860, the Commissioner of the Court of Claims was authorized to issue to the heirs of John Childress a land certificate for one league and one labor of land (amounting to about 4605 acres). His widow had, in the meantime, married one Miles Johnson, by whom she had a daughter named Mary. As the act of the legislature was expressed to be for the benefit of the heirs of John Childress, it would seem that no interest in the grant enured to the said Mary. On the 9th of March, 1860, a land certificate was issued by the Commissioner of the Court of Claims to the heirs of John Childress as authorized by the act. It was procured by, and delivered to, a lawyer of Austin by the name of John A. Green, who was employed by Judge Catron on behalf of the heirs to attend to the business. The heirs, John W. Childress and his brother George, seem to have been of a roving disposition. John appeared at Austin in December, 1860, and, supposing that his brother George, who had not been heard from recently, was dead, he gave Green a power of attorney to locate the said certificate in the following manner, namely, one-third for the benefit of his brother George, if he should be alive, and if not, then for John's own benefit; one-third for the benefit of Green, as a compensation for his services; and

one-third for the benefit of one John O. St. Clair, to whom John W. Childress had sold his own share. No location of the certificate was made until after the war.

In May, 1867, Green sold his one-third of the certificate to Doctor I. R. Worrall, of Austin. The deed given cannot be found, but it is alleged on the part of William Dunlap and others, and Martha R. Worrall and others, that it was given to Worrall's wife, Adaline S. Worrall, under whom they claim. The deed, as above said, is lost, and the records of Tarrant County were destroyed by fire in the spring of 1876, but Mr. Furman, a lawyer of Fort Worth, had, before the fire, made an abstract of titles from the county records, and in that abstract he finds, amongst other things, (1) a transfer from John W. Childress to John A. Green, conveying one-third of the grantor's interest in the Childress certificate, filed October 8th, 1868 (date not given); (2) a transfer of the same interest from John A. Green to Adaline S. Worrall, dated May 15th, 1867, filed October 12th, 1868. In addition to this evidence, in the deed from Dr. Worrall and his wife to E. M. Daggett, dated September 30th, 1869, and hereafter to be mentioned, it is recited that the land in question (conveyed by that deed) was the separate property of said Adaline S. Worrall. We think, therefore, that it may be regarded as proven that the deed for the one-third of the Childress certificate, given by John A. Green in May, 1867, was given to Adaline S. Worrall, though Green himself says that he has no recollection to that effect, and that all his transactions were with Dr. Worrall himself.

On the 28th of January, 1868, Dr. Worrall presented to the county surveyor of Tarrant County the following application for a survey, to wit:

"AUSTIN, *Jan'y 28th*, 1868.
" *County Surveyor, Tarrant County, Texas:*

"Sir: By virtue of certificate No. 186, issued by W. S. Hotchkiss to Jno. Childress' h'rs, now in your office, you will please survey for me 1,806,336 sq. vs. (320 acres) of land about one mile S. E. of Fort Worth, being the same land heretofore

surveyed in the name of T. P. Rutledge, the field-notes of which are hereby adopted as a full description of this survey:

"Beginning at the S. E. cor. of A. Briggs's survey and S. W. corner of B. F. Crowley's and running so as to embrace and include all the vacant land connected with said point. That is the said Rutledge survey.

"I. R. WORRALL."

A survey was made accordingly on the top of the Rutledge survey by adopting the notes of the same, and the county surveyor certified it as follows, to wit: "I, A. G. Walker, county surveyor for Tarrant County, do hereby certify that the survey designated by the foregoing plot and field-notes was this day made by me by adopting field-notes of the survey which was made, as above stated, the 16th January, 1852, and which I believe to be correct, and that the same is upon s'd survey which is in the name of T. P. Rutledge, certificate No. 134, class 3rd, issued by the board of land commissioners of Gonzales County the 12th day of October, 1846." Dated "this 28th day of May, 1868." On the 17th of June, 1868, a patent was issued on this survey to "the heirs of John Childress, deceased, their heirs and assigns."

It thus appears that the Childress survey, under which the complainants in the cross-bills claim title to the land in dispute, was purposely made by Dr. Worrall on the top of the Rutledge survey, under which Daggett had been in possession of the land for thirteen years. Of course such a title cannot be maintained unless the survey made under the Rutledge certificate was void. It is contended that it was void, first, because the certificate had been located on other lands in Fannin County, before its location on the lot at Fort Worth. This is true. Rutledge had procured a conditional head-right certificate for 320 acres as early as March 20th, 1839, from the board of land commissioners of Washington County; and had in March, 1846, procured a survey under it for 320 acres in Fannin County, which was duly examined and approved, and filed in the General Land Office; but was afterwards endorsed as forfeited for non-return of unconditional certificate by 1st

August, 1857. Rutledge seems to have abandoned this survey, and in October, 1846, obtained a new certificate in Gonzales County, as before stated, under which the survey in Fort Worth, Tarrant County, was made. It was permitted to a settler to abandon one location and adopt another. Indeed, the new certificate and location operated as an abandonment of the first, and the land became public land again, subject to location by other parties. In *McGimpsey* v. *Ramsdale*, 3 Texas, 344, the court sustained a survey made after a former survey under the same head-right had been abandoned, the judge who delivered the opinion saying: " If the question was a new one, I should feel strongly inclined to deny the right of Ramsdale to have raised his former location; but the practice commenced with our land system, and to upset it now, would disturb land titles to an incalculable extent." We do not think that the location of Rutledge's head-right in Fannin County was sufficient to prevent his obtaining a new certificate and a location in Tarrant County, unless he had sold or otherwise disposed of the lands in Fannin County. There is no proof in the case that he had done so; although one of the witnesses, Nance, who resides in Fort Worth, testifies that in September, 1859, being in Austin, and having understood that Daggett could not get his land patented, he inquired of Mr. White, the then commissioner of the General Land Office, why he could not, and the reason given was, that the conditional certificate had been issued long before and had been long before located in Fannin County by another man, to whom it belonged. But as there is no proof of this fact in the record, except the said hearsay testimony, we must conclude that this ground of objection to the Rutledge location is not sustained.

We do not deem it necessary to take particular notice of the Cass County location under the Rutledge certificate, which seems to have been abandoned; or of the survey under the William Sparks certificate, which was fully satisfied by other locations, and was never set up as establishing any right to the property in dispute. These documents may for the time have deterred the commissioner of the General Land Office from granting a patent to Daggett; but we do not see that they

present any insurmountable obstacle to the validity of the survey made by Johnson.

Another ground urged for maintaining that the said location was void when the Childress location was made is, that the unconditional certificate was withdrawn from the General Land Office and not returned within the time required by law. The old wrapper in which it had been folded, and which also contained the survey, was endorsed with the words, "forfeited for non-return of unconditional certificate by 1st Aug. 1857." And yet there was another still older memorandum in pencil, faint and partly obliterated, which read thus : " Unconditional certificate withdrawn by M. T. Johnson  .  .  .  Dec. 14, '57, for relocation." A. B. McGill testifies that he was a clerk in the General Land Office from 1859 to 1866, except a short period towards the close of the war ; and was chief clerk from 1865 or 1866 to 1870; that the endorsement, "forfeited for non-return of unconditional certificate by 1st Aug. 1857," is in his handwriting, and was written when he was chief clerk ; that the other endorsement, "unconditional certificate withdrawn by M. T. Johnson  .  .  .  Dec. 14, '57, for relocation," is in the handwriting of Robert M. Elgin, who was chief clerk of the said office in 1857, and until the close of the war ; that only the commissioner and chief clerk were authorized to make such memoranda or endorsements on the files ; that he (McGill) had no recollection of having seen the pencil memorandum at the time of making his endorsement in ink ; that from the appearance of the endorsements he would say that the pencil endorsement was made prior to the time when he (McGill) made the endorsements in ink referred to.

Joseph Spence, formerly commissioner of the land office, testifies as follows, to wit:

" I was commissioner of the land office in 1868.  The first knowledge that I had of the Thomas P. Rutledge survey in Tarrant County was after the Childress survey had been made and returned.  Dr. I. R. Worrall controlled the Childress survey and was anxious to get a patent upon it.  Upon examination of the Childress survey, it was ascertained to cover the Thomas P. Rutledge survey.  Mr. A. B. McGill, who was

chief clerk of the land office, referred to me both the Chil-dress and the Rutledge papers, with the information that the Rutledge certificate was not found among the papers of the file. We then together examined the papers, but failed to find the certificate. I remarked to him that we had better not patent until further investigation. Shortly afterwards Dr. Worrall insisted upon the patent issuing on the Childress certificate, and we, not finding the Rutledge certificate, determined to issue the patent on said Childress certificate, and did so."

This evidence shows that the Rutledge certificate was not in the land office, or could not be found therein, in 1868, when the Childress patent was issued, and when undoubtedly McGill, the chief clerk, made the endorsement testified to by him. But it fails to prove that it was not in the office on the 1st of August, 1857. The endorsements on the back of the certificate itself show that it was filed in the office October 4th, 1852 (probably at the same time with the survey); and across its face, in red ink, is written "Registered and approved Dec. 11, 1857." (Signed) "Jas. O. Illingsworth, Comm'r of Claims." This memorandum, in connection with the old pencil memorandum on the wrapper, "Withdrawn by M. T. Johnson . . . Dec. 14, '57," shows that, at that time, December, 1857, Johnson, who was undoubtedly acting for Daggett, was attending to the final authentication of the Rutledge certificate and survey, by getting it approved by the commissioner of claims; and that, for some reason, not now disclosed, he carried it away with him. [The presentation of the certificate to the commissioner of claims, and its registry by him, were made in pursuance of an act passed August 1st, 1856, which created the said officer, and required all land certificates (with certain exceptions) to be presented to him for registry within two years, or to be forever barred from location, surveys and patent.] The whole evidence, taken together, instead of showing, as supposed by McGill in 1868, when he made the endorsement on the wrapper, that it had not been returned to the office by the 1st of August, 1857, rather shows that it was never removed from the office until December, 1857. How long it

was then detained does not appear. We infer from the testimony that it was in the office in 1867. The official land map of Tarrant County was made in that year, and the land in question was marked and designated as the T. P. Rutledge survey, and so continued until 1873. This would hardly have been done if the certificate had not been in the office. When it was taken out of the office, after that, does not appear, — probably it was taken out by Daggett for some purpose and neglected to be returned, as it was shown that he was very careless about his papers. J. P. Smith, a lawyer of Fort Worth, and administrator of Daggett, testifies that in 1879 or 1880 he was counsel for him in a suit of Turner's heirs against him for a community interest under their grandmother, Daggett's wife, (who had died in 1871,) and he wanted the certificate in question; and, not finding it in the land office, he had Daggett search for it, and Daggett found it in his own safe and gave it to Smith, who, after keeping it two or three days, carried it to Austin by Daggett's authority, and handed it to the commissioner of the land office, and requested him to have it returned to its proper file in the office.

The laws which gave importance to the locality or place of deposit of the certificate were an act of the legislature of Texas passed August 30th, 1856, and another act passed April 25th, 1871. Paschal's Dig., Vol. I, Art. 4210, p. 701, and Vol. II, Arts. 7096–7099, p. 1453. The first of these acts declared "that all owners or holders who have conditional certificates now located, or surveys upon lands, shall return to the General Land Office the unconditional certificates, together with the field-notes of the same, on or before the first day of August, 1857, and all unconditional certificates which are not returned by that time, the said locations and surveys shall be null and void, and all such locations and surveys made by virtue of such conditional certificates shall become public domain, and subject to be located upon as other vacant lands." In our view of the evidence, this law did not affect the Rutledge title. The *prima facie* proof is that the certificate was in the land office from 1852 to December, 1857, and that the chief clerk, McGill, made a mistake in endorsing the wrapper as he did, "forfeited

for non-return of unconditional certificate by 1st August, 1857."
As already suggested, this endorsement was probably made in
1868, when Dr. Worrall applied for a patent on the Childress
survey; and no doubt was honestly made. McGill admits
that he did not notice the pencil memorandum on the old
wrapper.

By the act of 25th April, 1871, it was provided that in all
cases of location and survey of lands, by virtue of any genuine
land certificate, including head-rights, etc., the certificate should
be returned to the General Land Office with the field-notes
within the time prescribed for returning field-notes [which was
twelve months from the date of survey]; and the withdrawal of
it from the office should render the location and survey null and
void; with a proviso allowing a withdrawal where the certifi-
cate had only been located in part; and by the second section
of the act it was provided that, in all such cases, if the certifi-
cate was not on file in the General Land Office at the time of
passing the act, and had not been withdrawn for locating an
unlocated balance, it should be returned to, and filed in, the
said office within eight months from the passage of the act, or
the location and survey should be void. It was strenuously
contended that the case was within this statute, and, therefore,
that the Rutledge survey was void. But it is not absolutely
certain from the evidence that the Rutledge certificate was not
in the land office when the act of 1871 was passed, or that it
was not returned thereto within eight months from that time,
which period expired on the 24th of December, 1871. It is
true, it was not found by the clerk in 1868 when the patent
was issued on the Childress survey; and it was not found on
a subsequent search in 1875. Resort must be had to presump-
tions to conclude that it was not there in 1871. Will such a
presumption be raised in favor of another title superposed upon
the land at a time when the Rutledge certificate was perfectly
valid, and possession was enjoyed under it? And even if it
were sufficiently proven that the certificate was not in the
office during the years in question, the question would still
arise whether the claimants under the Childress survey and
patent can take advantage of this circumstance to maintain

their title to the property.   When that title was created, in 1868, as already intimated, the Rutledge survey was in full force and effect, and Daggett was in possession under it, and had been so for thirteen years.   Did, therefore, the injunction of the statute of 1871, requiring the survey to be returned to the land office within eight months, under penalty of being void if not so returned, enure to the benefit of the holders of the Childress patent, or did it enure to the benefit of the State?   The Childress survey when made was void, and therefore the patent issued upon it was void, because made and granted upon lands already appropriated under an elder title, which title, at that time, was perfectly valid, and only became invalid by non-compliance with a statute subsequently passed for reasons of public policy: did the Childress survey and patent, which were void at their inception, become invested with life and validity by means of the subsequent law and the failure to comply with it?   If the question was only one between the holders of the Rutledge title and the State, then no parties other than the State could take advantage of the omission to comply with the law.

The practice of locating certificates upon prior rightful locations is not favored by the laws of Texas.   It was declared by the act of August 30th, 1856, (Pasch. Dig. Vol. I, Art. 4575,) that whenever an entry is made upon any land which appears to be appropriated, deeded or patented by the books of the proper surveyor's office, or records of the County Court, or General Land Office, the party shall abide by it; and if judgment be rendered against him he shall not have the right to lift or re-enter the certificate, but the same shall be forfeited. The purpose of this act was further secured by the constitution of 1869, by the 10th article of which, section 3, it was declared that "all certificates for land located after the 30th day of October, 1856" (referring undoubtedly to, but mistaking the date of, the last mentioned act) "upon lands which were titled before such location of certificate, are hereby declared null and void," with a proviso in favor of inadvertent conflict with older surveys.   Of course if the certificate was made void, the location and survey were *a fortiori* void, and the

obtaining of a patent could not mend the matter, for it was decided by the Supreme Court of Texas, in *Morris* v. *Brinler*, 14 Texas, 285, that a subsequent locator having actual notice of a prior location will be postponed to the superior rights of the prior locator, although the subsequent location may have passed into a patent.

The provision of the constitution of 1869, just cited, was retrospective, was in force when the act of 1871 was passed, and was carried forward, as to all future locations and surveys, into the constitution of 1876, which declared, " that all genuine land certificates heretofore or hereafter issued shall be located, surveyed, or patented only upon vacant and unappropriated public domain, and not upon any land titled or equitably owned under color of title from the sovereignty of the State, evidence of the appropriation of which is on the county records or in the General Land Office, or when the appropriation is evidenced by the occupation of the owner, or of some person holding for him." Art. 14, sect. 2.

These constitutional provisions, (whose validity upon the subject in hand cannot be seriously questioned,) taken in connection with the act of 1856, had the effect to make void the location of the Childress certificate upon the land in dispute ; for, at that time (1868) the said land was " appropriated " and "titled " by the survey under the Rutledge certificate, which was duly recorded in the county records and entered and filed in the General Land Office, plotted on the map of Tarrant County, and evidenced by the long-continued occupation of Daggett. If, then, the Childress location was absolutely void at its inception, how could it be revived by the subsequent failure of Daggett to comply with the act of 1871 ? It seems to us quite clear that it could not be, and that said failure enured to the benefit of the State alone. But the State has never availed itself of the omission; and it is probable that nothing but a direct proceeding to vacate the survey would be effectual for the purpose. Daggett and those claiming under him having always been in notorious possession of the land, no person could lay any new location upon it without full knowledge of their pretensions to the ownership; and it was held

by the Supreme Court of Texas in the recent case of *Snider* v. *Methwin*, 60 Texas, 487, that no one having knowledge of the continued claim of those who made title to land under a certificate could acquire any right to said land, although said certificate had been taken from the land office prior to the passage of the act of 1871, and was not returned within the period required by that act. It is true, that the certificate in that case had been taken from the office by a person who had no interest in it, or right to control it; but the parties interested had notice of its absence in time to have supplied a duplicate, but did not do so until after the prescribed time had expired.

In the present case the certificate was returned to the office in 1879 or 1880, from which it had probably been inadvertently detained by Daggett. As between the parties to this controversy, our opinion is, that the Rutledge title must prevail, and that it is a sufficient protection to the defendants against that set up by the complainants in the cross-bills.

This view of the case renders of less importance a question which might have been very material as between the original complainants, Thomas H. Miller and others, and the defendants, had not the former been barred by the decree annulling Rutledge's will. We refer to the question as to the assignment by Rutledge of his certificate to Brinson and by Brinson to M. T. Johnson. We are satisfied from the evidence in the case that Rutledge sold said certificate to Brinson and that Brinson sold it to Johnson, at whose instance, and in whose behalf, it was located on the land in question. M. J. Brinson, son of Matthew Brinson, to whom it is alleged Rutledge sold the certificate, testifies that about 1848 or 1849 Rutledge and one Gill were in the business of horse-raising and horse-trading, and were occasionally at his father's place in Shelby County, and one deal they made with him was the sale to him of the land certificate in question for which the witness's father gave them a pony belonging to witness, (who was then about twenty years old,) and his father gave him another horse instead of it; that afterwards, about 1851, M. T. Johnson bought the certificate of witness's father; and that Johnson afterwards

traded it to Captain E. M. Daggett. It is true, the witness did not handle the certificate, but derived his knowledge of it from conversation with his father and cotemporaneous knowledge of the transactions. The witness further states that whilst his father (Matthew Brinson) owned the certificate he employed Gill to locate it, or have it located for him; but found that he was making a fraudulent use of the certificate, using it in what he termed "lariating land," in Fannin County; and he was obliged to institute proceedings to get possession of it, and finally got it back from some member of Gill's family after his death.

But no assignment of this certificate from Rutledge can now be found. If one ever existed, it is lost or has been destroyed. However, if a sale of the certificate was actually made by Rutledge to Brinson, and by the latter to Johnson, it matters little whether it was actually assigned in writing or not, as it is well settled in Texas that the land certificates of that State are chattels, and may be sold by parol agreement and delivery, whereby the purchaser acquires a right to locate the certificate and procure a patent in the name of the grantee, but for his own use, he becoming thereby the equitable owner of the land located. *Cox* v. *Bray*, 28 Texas, 247; *Peevy* v. *Hurt*, 32 Texas, 146; *Stone* v. *Brown*, 54 Texas, 330, 334; *Parker* v. *Spencer*, 61 Texas, 155, 164. In *Cox* v. *Bray*, Chief Justice Moore said: "But even if the contract were within the statute" [of frauds] "the payment of the purchase money, the location of the land, the procuring of the patent, and the possession and improvements made upon it by the defendant and those under whom he claims, would, as has been frequently decided by this court, have presented sufficient equity to have entitled the defendant to a decree of title, if he had brought a suit for this purpose within a reasonable and proper time. . . . And it certainly could not be less effectual to protect him against the wrongful efforts of the vendor to deprive him of his possession and equitable title to the land, however long he may have delayed his suit for this purpose." p. 261.

Even when a written assignment was made, it was often

made with a blank space left for the name of the assignee, to be filled up with the name of any subsequent purchaser who saw fit to insert his own name therein, — much the same as blank assignments of corporation stock, which pass from hand to hand, perhaps a dozen times, before they are filled up with the name of an assignee. It is distinctly stated in *Hill* v. *Moore*, 62 Texas, 610, 614, that "land certificates were the subjects of transfer, and often passed through the hands of many persons by an assignment in blank." In that case one Jowell owned a land certificate as community property, and, after his wife's death, sold it to one who was a purchaser in good faith, and without notice of the community. The heirs of the wife brought suit for a portion of the land located under the certificate; and contended that the purchaser was bound to take notice of the wife's interest. But it did not appear on the record whether the certificate was issued on Jowell's own head-right, or some other person's. The court held that, for all that appeared, it might have been obtained in the way indicated above. "So far as the record shows," says the court, "it may have been true that Jowell purchased the certificate through a blank assignment, and that he transferred with this assignment on it, simply by delivering it to the persons through whom the appellee claims; if so, his name would not even appear, either on the certificate or on any writing by which the transfer was made, and in such case a purchaser would not be put on inquiry as to the rights of other persons, unless it be of those persons who claim by inheritance from the original grantee, or some one in whom a right vested by operation of law, at the time the certificate issued."

There seems to have been an assignment of this kind of Rutledge's unconditional certificate. Two witnesses are sworn in the case who distinctly testify that they saw it, with Johnson's name inserted as assignee. One of these is C. G. Payne, of Dallas County, Texas, an attorney-at-law. He states that in January, 1868, he visited the land office at Austin, to investigate some land claims and land locations in Tarrant County. Whilst there he examined the Rutledge claim. He says he found that two certificates had been issued to Rutledge;

namely, a conditional one upon which a survey had been made in Cass County; and an unconditional certificate transferred by Rutledge to M. T. Johnson, and by Johnson located in Tarrant County at Fort Worth upon the land now in controversy, the field-notes and survey returned to the General Land Office, and there filed, mapped and platted, and the patent refused on account of the unconditional certificate located in Cass County. He says that the transfer of the latter certificate from Rutledge to Johnson was written in a coarse, rough, round handwriting. The usual form of transfers of certificates was used. The substance of said transfer was an assignment of all right, title, claim and interest of said T. P. Rutledge of, in and to the said certificate to the said M. T. Johnson, and authority therein authorizing the commissioner of the General Land Office to issue the patent to the said M. T. Johnson or to his assigns. On his cross-examination the witness says, that the transfer was acknowledged before some officer authorized to use a seal, and had his certificate of acknowledgment and seal thereon. He states that he also saw the deed from Johnson to E. M. Daggett on record in Tarrant County.

The other witness who testifies to having seen the assignment of the unconditional certificate from Rutledge to Johnson is W. H. H. Lawrence. He testifies that he was engaged in the land business at and about Fort Worth; that he had transactions with E. M. Daggett from 1873 to 1878, and examined his title papers at his request, especially in reference to the 320 acres tract known as the Rutledge survey; that this examination was made, he thinks, in 1876, and he distinctly remembers making a favorable report to Daggett after he had finished the examination. He further says: "My recollection is that among the papers I examined was the Thomas P. Rutledge certificate. I did find a transfer of such certificate to M. T. Johnson. I am sure of this, because had it not been present I should have known that the title from Rutledge was defective." Being asked from whom, to whom, and the form thereof, he said: "I can only say that it was from Rutledge to M. T. Johnson, and in the usual form of transfers of such

certificates." The witness further states: "If there had been no transfer I should have discovered it and made a different report." To another interrogatory he added: "I had occasion in very many cases to look up the titles of different lands in Texas, and became familiar in the course of five years in the land business at Fort Worth with the general laws of the State in regard to lands, as also familiar with the examination of titles."

Apparently (but perhaps not necessarily) opposed to the hypothesis that the certificate in question was purchased by Johnson from Brinson is the evidence of Henry Beaumont, who testifies that in the winter of 1851–2 he placed a lot of land certificates, including the T. P. Rutledge certificate for 320 acres, in the hands of M. T. Johnson for location, under a written contract: and that the certificate in question had come into his hands with others from a party (whose name he does not mention) who had been engaged in locating and surveying lands, and was then retiring from the business. In corroboration of this testimony a receipt in the handwriting of M. T. Johnson was produced in evidence, a copy of which is as follows, to wit:

"Rec'd, Austin, March 9, 1852, of Henry Beaumont the following land certificates, to be located or accounted for, viz.:

|  | Acres. |
|---|---|
| "Four leagues Calhoun County school lands for location. | 17,712 |
| Thomas Rutledge, H. R., 320, class 3, Gonzales County, 12 Oct., 1846. | 320 |
| Wm. P. Milby, H. R., 640, class 3, No. 24, Liberty County, 4th March, 1845. | 640 |
| John Becton, 320 H. R., 3rd class, No. 234, Victory County. | 320 |
| Sam'l Hudler, bounty warrant, dated Jan'y 1st, 1838, signed Barnard Bee, sec. war. | 1,280 |
| James H. Barnwell, bounty warrant, 7th January, 1837, signed G. W. Poe, pay gen'l. | 320 |

Acres.

Toby scrip, No. 864, to Almanzo Houston, dated Oct.
    10, 1836. . . . . . . . . . . . . . . . .    640
(Signed duplicate.)
        (Sign'd)                          M. T. JOHNSON.
    Endorsed: 'Henry Beaumont land matters.' "

A duplicate of this receipt was found amongst Johnson's
papers after his death by J. P. Smith, his administrator.

It is somewhat difficult to reconcile this evidence with that
of the other witnesses. There is evidently wanting some un-
discovered explanation of the discrepancy. Beaumont says
that he only had the certificate for location, and that John-
son was to divide with him the emoluments thereof, — which
were always one-third of the land located. From the testi-
mony of J. P. Smith, Johnson's administrator, it appears that
Beaumont and Johnson had had dealings together in the loca-
tion of land certificates for some years prior to the date of the
receipt, to wit, in 1850 and 1851. The certificates mentioned
in the receipt were probably received by Johnson at some
time, or at different times, previous to the giving of the re-
ceipt. One of the certificates was that of Wm. P. Milby, for
640 acres, class 3, No. 24, issued 4th of March, 1845. This
certificate was located June 25th, 1850, — a year and nine
months before the date of the receipt. The certificate in ques-
tion, that of Rutledge, was located January 8th, 1852, two
months before the date of the receipt. The suggestion of the
complainants that the survey was antedated has no evidence
to support it. That, in some way, Johnson had become
entitled to these certificates (especially to the Rutledge certifi-
cate) is corroborated by strong circumstances. Smith, John-
son's administrator, says that Beaumont never asserted any
claim to the land mentioned in the receipt. He had corre-
spondence and communications with Beaumont after Johnson's
death. He says that there was an agreement between them
that Johnson should locate the certificates placed in his hands
by Beaumont, and was to have for doing so one-half of such
interest as Beaumont had in them; yet no claim for any
accounting was ever made after Johnson's death. It is quite

possible that Beaumont obtained the Rutledge certificate from Gill, who used it as a "lariat" for improperly locating land; and that Johnson bought it of Brinson on ascertaining that it belonged to him. This would explain why Beaumont never asserted any claim to the land located under it, although it subsequently became so valuable.

Be all this as it may, it is clear that Johnson, either as owner of the certificate or as an agent employed for locating it, and as such having, according to usage, an interest in the lands to be surveyed, was fully authorized to make the location under it which he did make, and to take possession of the lands either for his own use (if he was the owner) or for the use and benefit of himself and the actual owner; and that his title and possession thus acquired was good against all the world, except those who could produce a better title than that which the certificate and the location under it secured. The legal title, it is true, was in Rutledge's heirs; but the equitable title was in Johnson, (if he did in fact purchase the certificate,) and, in any event, one-third of such equitable title belonged to him, as the authorized locator of the certificate, and the residue was in his hands and possession for the use of the owners whom he represented. The location and survey were good as against the State, and all other persons claiming by inferior title. E. M. Daggett as purchaser from Johnson, and obtaining possession from him, and the defendants as successors of Daggett, became entitled to the benefit of the Rutledge survey as a protection against all persons claiming under a title inferior thereto.

But this is not the whole case. There are other points which go to fortify the position of the defendants, which it is proper to notice.

After the Childress certificate was located by Dr. Worrall in 1868, E. M. Daggett, who had then been in possession under the Rutledge title for the space of fourteen years, purchased in, as he supposed, the entire Childress claim. In 1868 or 1869 George R. Childress, the second son of John Childress, appeared at Fort Worth, having returned from California, where he had been residing for many years. He did not know

that his brother John was living, but supposed him dead, and that he, George, was his father's sole heir. He claimed the land in question, and Daggett compromised with him for about three hundred dollars, and George gave a deed selling and relinquishing all his right and title to Daggett in fee, with a general warranty against himself, his heirs, and all others. He afterwards went to Austin, saw Green, learned of his brother's being alive, and confirmed the arrangement made by the latter with Green, who acted therein for the benefit of Dr. Worrall.

In September, 1869, Daggett also compromised the claim of Dr. Worrall and procured a deed from him and his wife, Adaline S. Worrall. This deed is in the usual form of deeds of bargain and sale. It is dated 30th of September, 1869, recites a consideration of three hundred dollars, conveys to Daggett the land in dispute by metes and bounds, as in the Childress patent, and recites that the land was the separate property of the said Adaline S. Worrall, referring to the deeds from John W. Childress to Green and from Green to the said Adaline. The deed concluded with this habendum and warranty, to wit: "To have and to hold to him, the said E. M. Daggett, his heirs and assigns forever, free from the just claim or claims of any and all persons whomsoever, claiming or to claim the same." The deed was acknowledged before a notary public, and a certificate of said acknowledgment was made in due form, with one exception; it contains no statement that Adaline S. Worrall, the wife, was privily examined by the officer apart from her husband. This is necessary in order to validate a conveyance of the wife's separate property in Texas, and its absence cannot be supplied by showing that she was actually privily examined. *Berry* v. *Donley*, 26 Texas, 737; *Fitzgerald* v. *Turner*, 43 Texas, 79; *Looney* v. *Adamson*, 48 Texas, 619; *Johnson* v. *Bryan*, 62 Texas, 623. To the same effect see *Elliott* v. *Peirsol*, 1 Pet. 328, 340; *Hitz* v. *Jenks*, 123 U. S. 297, 303. This seems to be a fatal defect; and it is on this defect that the complainants in the cross-bills rely. Their position is, that the land was Mrs. Worrall's separate property, that she never executed any conveyance of it accord-

ing to law, and that it was hers when she died in November, 1870, and descended, one-half to her husband, Dr. I. R. Worrall, and one-half to her brothers and sisters, represented by William Dunlap and others. The complainants in the other cross-bill, Martha R. Worrall and others, claim the other half of the property as heirs of Dr. Worrall, being his mother and his brothers and sisters. They contend that Dr. Worrall had no interest to convey when he executed the deed with his wife in 1869, and hence the one-half part which he inherited from his wife in November, 1870, was unaffected by that conveyance. It is true, if the deed contained a warranty, he would be estopped from claiming the land; but it is contended that the clause above recited does not amount to a warranty. It has been decided, however, by the Supreme Court of Texas that words substantially such as those contained in the deed do import a general warranty. In *Rowe* v. *Heath*, 23 Texas, 614, the following words were so construed, to wit: "For him the said R. H., his heirs and assigns, to have and to hold forever, as his own right, title and property, free from the claim or claims of me, my heirs, or creditors, and all other persons whomsoever, to claim the same or any part thereof lawfully." In our judgment the deed of Worrall and his wife did contain a general warranty, and the one-half part of Adaline S. Worrall's interest which descended to Dr. Worrall was carried by estoppel to Daggett when Dr. Worrall inherited the same from his wife.

The other questions arise on the statute of limitations. The defendants pleaded the limitations of three years and of five years, and also peaceable possession for thirty years. The act of February 5th, 1841, first created the limitations referred to. The 15th section created that of three years, declaring that: "Every suit, to be instituted to recover real estate, as against him, her or them, in possession under title, or color of title, shall be instituted within three years next after the cause of action shall have accrued, and not afterwards;" not computing the duration of disability from minority, coverture or insanity; and by *title* meaning regular claim of transfer from or under the sovereignty of the soil; also reserving the right of the government.

The 16th section created the limitation of five years, declaring that: " He, she or they who shall have had five years like peaceable possession of real estate, cultivating, using or enjoying the same, and paying tax thereon, if any, and claiming under a deed, or deeds, duly registered, shall be held to have full title, precluding all claims ; but shall not bar the government ; " and saving disabilities for non-age, coverture or insanity.

Now supposing that the prerogative of the government prevented the statute from running until after the patent issued to the heirs of John Childress in June, 1868, it certainly commenced to run at that time against those who claimed under the patent ; and the facts present a strong case of adverse possession on the part of E. M. Daggett and his grantees. They were in full, continuous and peaceable possession for a period, altogether, of thirty years, namely, from 1854 to 1885, when William Dunlap and others appeared as intervenors in this suit ; and from 1854 to 1886, when the Worralls intervened. This possession was complete in the use, cultivation and enjoyment of the land in dispute, and the payment of taxes thereon. It was claimed and exercised under a regular deed of conveyance from M. T. Johnson, dated 23d June, 1855, which granted and conveyed, not only the certificate of Rutledge, but the land located under it, describing and identifying the same ; and which was duly registered in the records of Tarrant County on the 30th of March, 1857. It is difficult to see why the plea of limitation of five years at least is not a good bar against the heirs of Adaline S. Worrall. She died November 4th, 1870, and one-half of her estate descended to her husband, I. R. Worrall, who survived to the 22d September, 1871. The statute having commenced to run against him, was not suspended by his death, and had been running more than fourteen years at the commencement of the suit. The other half of Adaline S. Worrall's estate descended to her brother, John Cook, and her two sisters, Alizannah, wife of William Dunlap, and Matilda, wife of Dr. Jonas Fell. John Cook was living at Adaline's death, and survived to August, 1873. The sisters were married women when Adaline S. Worrall died, but as

her disability as a married woman had already prevented the statute from running during her lifetime, their disability, according to the law of Texas, cannot be added to hers. It was decided by the Supreme Court of Texas in the cases of *White v. Latimer*, 12 Texas, 61, and *McMasters v. Mills*, 30 Texas, 591, that one disability cannot be tacked to another so as to prolong the disabilities beyond the continuance of that which existed when the cause of action accrued. See, also, Wood on Limitations, § 251, and notes. According to this rule the statute commenced to run at the death of Adaline S. Worrall, on the 4th of November, 1870. If this be so, as we think it is, the complainants in the cross-bills are barred by the statute of limitations.

The new statute of limitations contained in the Revised Statutes, which went into effect on the 1st day of September, 1879, does not materially differ, so far as its application to the present case is concerned, from the old statute of 1841 ; and it is explicit in declaring that "the period of limitation shall not be extended by the connection of one disability with another." Rev. Stats. Texas, 1879, Art. 3225.

In our judgment, the statute of limitations is a complete bar to the claims set up by the complainants both in the original and in the cross-bills, whether we are right or not in regard to the validity of the Rutledge title.

*The decree of the Circuit Court is affirmed.*