PUGH et al. v. FRIERSON et al.

(Circuit Court of Appeals, Sixth Circuit. March 12, 1915.)

No. 2451.

**1.** WILLS ⬅524—GIFTS TO CLASS—TIME OF ASCERTAINMENT OF CLASS—CLASS DOCTRINE.

Under a will giving property to certain persons for life, and at their death to be divided among their children then living or the issue of any which might have died, and another will giving property to the same persons for life, and at their death to go to their female children, the children of any deceased child to be entitled to the same share their mother would have been entitled to if alive, since the time fixed for distribution among the remaindermen was dependent upon a future event, and the remaindermen were subject to fluctuation in numbers by births and deaths, the remaindermen surviving at the death of the life tenant were, under the "class doctrine" prevailing in Tennessee, entitled to the property, and the estate vested in the described class as a class, and not individually in the persons composing the class, and survived to and vested in the persons constituting the class at the period when the distribution was to be made.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1116–1127; Dec. Dig. ⬅524.]

**2.** WILLS ⬅524—GIFTS TO CLASS—DECEASED MEMBERS OF CLASS—REPRESENTATION.

Under the "class doctrine" prevailing in Tennessee, a class of remaindermen described in a will will include the issue of members dying before the time for distribution, whenever such inclusion appears to have been fairly within the testator's intent.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1116–1127; Dec. Dig. ⬅524.]

**3.** COURTS ⬅367—UNITED STATES COURTS—AUTHORITY—DECISIONS OF STATE COURTS—RULES OF PROPERTY.

The uniform rule of construction in Tennessee, that a remainder devised to a class vests in the remaindermen surviving at the time for distribution, where such time is dependent upon a future event and the remaindermen are subject to fluctuation in numbers by births and deaths, will be followed by the United States courts; it having evidently become a settled rule of property.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 958, 959; Dec. Dig. ⬅367.]

Conclusiveness of judgment between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank v. City of Memphis, 49 C. C. A. 468; Converse v. Stewart, 118 C. C. A. 215.]

**4.** LIFE ESTATES ⬅23—SALES AND CONVEYANCES BY LIFE TENANT.

Where land was devised to W. for life, with remainder to her children, or her female children living at the time of her death, and the issue of such as might predecease her, a conveyance by W. and her daughter, who predeceased her, could not deprive the children of such daughter of their right to the remainder upon W.'s death.

[Ed. Note.—For other cases, see Life Estates, Cent. Dig. §§ 21, 42–45; Dec. Dig. ⬅23.]

**5.** JUDGMENT ⬅686—PARTIES BOUND—REPRESENTATION.

P. devised one of seven lots to each of his children, the devise to his daughters W. and M. being for life only, with remainder to their children living at the time of their death and the issue of any deceased child. F.,

one of the sons, devised his property to his sisters W. and M. for life, with remainder to their female children and the issue of any deceased child. In a partition suit, lot No. 5 was sold for partition between W. and M. as the lot which would have been set apart to F., but with W.'s consent and by order of court her share of the purchase price was paid to M. on account of an indebtedness. This and other suits were disposed of by a decree regarded by the parties as a final settlement of P.'s estate. In a subsequent suit the court approved an agreement by which W. was to transfer her interests in both estates to M. on account of the indebtedness, and W. and her children conveyed the lot set apart to W. to M. W. and her children, including plaintiffs' mother, who died before W., sued to recover their share in lot 5, but the bill was dismissed. P.'s administrator was a party to the partition suit, but not to any of the other suits, and no legal representative of F. was a party to any of the suits. Plaintiffs, though in being when the decree settling the estate was made and when the suit to recover the interest in lot 5 was commenced, were not made parties to any of the suits. *Held* that, under the doctrine of virtual representation, plaintiffs could not be regarded as parties to such suits by representation and bound by the decrees, as that doctrine will not apply unless the representation is both real and necessary, especially where the purpose is to dispose of property, and not to preserve it in specie, or in some other form, and the persons claimed to have represented plaintiffs not only had interests adverse to plaintiffs, but apparently ignored plaintiffs' interests.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1209; Dec. Dig. ☞686.]

**6. REMAINDERS ☞17—ACTIONS BY REMAINDERMEN—LIMITATIONS AND LACHES.**

Where land was devised for life, with remainder to the children of the life tenant living at her death and the issue of those predeceasing her, a suit by children of a daughter of the life tenant who predeceased her to recover an interest in land conveyed by the life tenant and the daughter was not barred by laches, or by the statutes of limitations of 3, 7, or 10 years, where it was brought within 13 months after the life tenant's death, as they had no right of action during her life, and, having no right of action, could not be guilty of laches.

[Ed. Note.—For other cases, see Remainders, Cent. Dig. §§ 12–17; Dec. Dig. ☞17.]

Appeal from the Circuit (now District) Court of the United States for the Middle District of Tennessee; Edward T. Sanford, Judge..

Suit in equity by John W. Pugh and others against John W. Frierson, individually and as administrator, executor, and guardian, and others. Decree for defendants, and complainants appeal. Reversed and remanded.

This was a suit in equity, and instituted August 10, 1908, for specific purposes, and for general relief. The names of the parties to the suit when it was commenced appear in the margin,[1] but a change has since been made by reason of a death as stated later.

1. *Specific Objects of Suit.*—(a) To recover possession of an undivided one-fourth interest in a lot, called No. 5, and an undivided one-third interest in

---

[1] The parties: John W. Pugh, H. Allen Pugh, Edward F. Pugh, G. Preston Pugh, Kathleen Pugh, John McConnachie and his wife, Ellen (formerly Pugh), plaintiffs, appellants, against John W. Frierson, individually and as administrator of Ellen K. Mayes, as executor of Mary Gentry Frierson, and as guardian of Elleanor Frierson, John W. Frierson, Jr., and Bradley M. Frierson (minors, and such minors are also named as defendants individually), Phœnix National Bank of Columbia, and A. S. James, defendants, appellees.

another lot, called No. 7, both situated in Columbia, Maury county, Tenn., together with the rents and profits derived from such undivided interests since the death of the life tenant, Maria L. Williams; or, alternatively as to lot 5, if it should be adjudged that a certain sale made of such one-fourth interest in the lot and complained of herein was valid, then to recover a like portion of the purchase money, with interest;

(b) To have certain proceedings of the chancery court of Maury county declared void as respects plaintiffs, and for an accounting as to particular funds which were involved therein, and which are alleged to have been diverted from the trusts and purposes created and declared by the wills of Patrick McGuire and Francis McGuire; and

(c) For an accounting with the estate of Ellen K. Mayes touching her acts as administratrix of the estate of Francis McGuire, and to recover from her estate (in possession of defendants) a certain share of funds alleged to belong to such McGuire estate.

2. *Facts Disclosed by Pleadings and Exhibits.*—The defendant John W. Frierson died testate after the present suit was brought, and under an amended bill the cause was revived in the name of his executor, W. S. Fleming, who was also appointed guardian ad litem to appear and make defense to the original and amended bill for the minor defendants before named. The real estate involved came from Patrick McGuire, the common ancestor of all the individual parties to the suit except Fleming and James. Patrick McGuire died testate at his home in Maury county in 1850, and left surviving him his widow, Martha McGuire, six children, and also children of a deceased daughter. The will provided, among other things, that the widow should receive an annuity of $500, which (as far as practicable) was to be paid out of rents to accrue from seven storerooms, with the lots on which they stood (including lots 5 and 7 above mentioned), belonging to the estate, and all situated in Columbia, and that at the death of the widow each of the children should receive one of these storerooms, with its lot, and be charged with its cash value in the general division to be made of the property devised. The estate was ultimately to pass in seven equal shares, one to each of testator's surviving children and the remaining share to the children (one a daughter) of his deceased daughter, subject, however, to certain limitations imposed upon the interests of his own daughters and that of the granddaughter. Portions of the shares of three of testator's children, and only three, to wit, a son, Francis McGuire, and two daughters, Maria L. Williams and Ellen K. Mayes, are involved in the present controversy. After setting out in his will certain advancements which he had made to his children, and with which they were to be charged and their interests so equalized, the testator, Patrick McGuire, provided by two items of his will thus:

"Thirteenth. After all my children and the children of my daughter Mary A. Looney, deceased, they representing their mother, are made equal, as above provided, I direct that the balance of my property, real, personal and mixed, and of whatever nature, kind and description it may be, be equally divided amongst my said children, and the children of my said daughter Mary A. Looney, they representing their deceased mother (taking one share).

"Fourteenth. The interest that my said daughters and my granddaughter Betty Looney may take under the provisions of this will, I give to them for their sole and separate use and benefit, and the use and benefit of such child or children as they now have, or may hereafter have, during their natural lives, to be held by them free from the debts, liabilities and contracts of their present, or any future husbands which they may have. And at the death of my said daughters and my granddaughter Betty Looney the share of said property, and the increase of the same belonging to each, to be equally divided amongst their children then living, or the issue of any which may have died before their parents (their mothers)."

R. B. Mayes, John Williams, and Francis McGuire were named in the will as executors of the estate, but Mayes alone qualified and acted in that capacity until his death in 1860. John Frierson was thereupon appointed and qualified as administrator de bonis non with the will annexed, and acted in that capacity until May 10, 1878; and on that date a settlement of the estate was reached

which at least some of the interested parties have regarded as final. Several suits were brought to close the estate:

(a) In March, 1851, Martha McGuire, the widow of testator, and all his children and the children of his deceased daughter, united in a proceeding brought in the chancery court of Maury county to dispose of all the lands of the estate, through sale or partition, except those specifically devised. Admittedly, all were sold and conveyed in this proceeding except the seven storehouses; but on account of certain irregularities occurring in such sales, Francis and C. P. McGuire, sons of Patrick McGuire, filed a bill in the same court in June, 1853, against the widow and the remaining plaintiffs joined with her in the first suit, and also the children then in existence of Ellen K. Mayes and Maria L. Williams, for the purpose of having the sales so made in the first suit ratified. These two suits were consolidated; and admittedly the court thereupon directed payment of the sales proceeds to be made to the daughters and their husbands in the proportions of the daughters' several shares, which, however, were to be held by the husbands, respectively, subject to the trusts, limitations, and provisions of the will of the testator.

(b) Meanwhile, in November, 1852, R. B. Mayes, as executor of the estate, commenced an action in the same court against the immediate children of testator and the children of his deceased daughter, setting forth the various steps of his administration of the estate, the sales of lands, division of shares, and the advancements that had been made, and in effect sought an order approving the same; but it is alleged in the bill in the present case and admitted by the answer that "none of those entitled to the remainder interest in said property after the death of the daughters of said Patrick (McGuire) were made parties to said bill, although there were at the time several children born to said daughters." In respect to that case, it is alleged and admitted in the pleadings of the present case that a number of accounts were stated, that the advancements made by the testator were set forth, and that a decree was entered declaring that it was the intention of the testator, Patrick McGuire, that the shares of his daughters should be paid to their husbands, without the intervention of a trustee, and without security, and that the executor was directed to pay over to Maria L. Williams and John Williams, her husband, upon their joint receipt, whatever might be due them under the decree.

(c) A suit was begun in the chancery court of Maury county, on August 17, 1866, to partition the storeroom property before mentioned. John Frierson, as administrator de bonis non with the will annexed of Patrick McGuire, and also administrator of R. B. Mayes' estate, with the children and grandchildren of Patrick McGuire, including Mary L. Pugh (a daughter of Maria L. Williams and the mother of the present plaintiffs, except John McConnachie) and Mary Gentry Frierson (a grandchild of Ellen K. Mayes), appear to have been parties to that suit, though the plaintiffs and defendants in the instant case were not, and it does not appear whether any of them were then in being. Meanwhile the widow of Patrick McGuire had died; and Francis McGuire had died testate at his home in Mississippi (in 1863), bequeathing and devising his estate entire to his sisters, Ellen K. Mayes and Maria L. Williams, share and share alike, for and during their natural lives, the will providing:

" * * * This bequest and devise is to their sole and separate use, in which their husbands respectively shall have no right or interest. Each of my said sisters shall be entitled to one-half the estate I shall give at the time of my decease; that is to say, my whole estate shall be equally divided between them, share and share alike, but the estate each takes shall terminate on their decease, being limited to them for their natural lives. On the decease of my said sisters then the portion each takes shall go to the female child or children each may have at the time of her death, share and share alike. * * * In case my said sisters should have daughters married during the lifetime of their mothers and should die before her mother, leaving children, and these children or any of them should be alive at the decease of my sisters respectively, the children shall be entitled to the same share the mother would be entitled to if then alive."

On September 25, 1867, an order was entered in the partition proceeding (presumably because of the will of Francis McGuire) directing that lot 5 "be

sold for partition" between Mrs. Mayes and Mrs. Williams. Mrs. Mayes became the purchaser at $4,000; but, it appearing that Mrs. Williams and her husband were then indebted to Mrs. Mayes for more than one-half the purchase money, Mrs. Williams' one-half was by her consent and the order of the court turned over to Mrs. Mayes. And it was further provided by the order "that all the right, title, claims, and interest of all of the other parties in and to lot No. 5 in the pleading, report of commissioners, and of the clerk and master specified be divested out of them, and vested in Mrs. Ellen Mayes during her natural life, and then to her children, as under her father's will, and that a copy of this decree be registered."

Independently of this provision as to lot 5, in the partition proceeding Mrs. Mayes received lot 4 and Mrs. Williams lot 7, subject to the provisions of their father's will limiting their shares to life interests. It is to be observed, moreover, that if this partition proceeding had taken place in the lifetime of Francis McGuire, and lot 5 had been set apart to him, he would under his father's will have received the lot in fee simple, but that under the will of Francis McGuire the interests of Ellen K. Mayes and Maria L. Williams, respectively, in lot 5, were equal undivided life estates; and, as we have just seen, in the order entered in the partition proceeding, approving the sale of Maria L. Williams' life interest in lot 5 to Mrs. Mayes, the right of the latter in the lot was in terms limited to her natural life, "and then to her children, as under her father's will." It should also be stated that in the year following the close of this partition proceeding, February 1, 1868, Maria L. Williams united with her husband and all her children in conveying lot 7 to Ellen K. Mayes, and among the children so uniting in the conveyance was Mary L. Pugh.

All the foregoing suits were further heard and were disposed of on May 10, 1878. It is in effect admitted by the pleadings that in disposing of these cases a decree was entered finding that there was due upon the share of Maria L. Williams in her father's estate $2,237.31, and upon her share in her brother's estate $1,433.74; and it is averred, though not in terms admitted, that Ellen K. Mayes received these sums, to wit, $3,671.05, and the decree then entered was regarded by the parties to the suits as a final settlement of the estate of Patrick McGuire.

(d) There was still another suit, wherein approval of a certain agreement was entered, which had an important bearing upon the settlement of the Patrick McGuire estate. It was a suit of John Frierson, as administrator of the estate of R. B. Mayes, against Ellen K. Mayes and others, brought in the Maury county chancery court, the decree in which was entered December 4, 1868. Neither Maria L. Williams nor any of her children were parties to the suit. Its object was to obtain the court's approval of a compromise agreement, dated September 15, 1867, between Frierson, as such administrator, and John Williams. Williams was largely indebted to the estate of R. B. Mayes, and the agreement required Williams to turn over certain of his property to the administrator, and also to procure from his wife, Maria L. Williams, an assignment to such administrator of her interests in the estates of her father, Patrick McGuire, and her brother, Francis McGuire. Ellen K. Mayes, widow, was to receive such property and interests on account of her interest in the estate of R. B. Mayes. The court approved of the agreement, as stated, and it was apparently in partial execution thereof that Mrs. Williams' interests in lots 5 and 7, as also the sum of $3,671.05, were transferred to Mrs. Mayes, as before pointed out.

3. *Suit and Decree Pleaded in Bar Here.*—Nothing further appears to have been done respecting the estates of Patrick McGuire and Francis McGuire, certainly nothing concerning the interests involved here, until 1890. On October 1st of that year, Maria L. Williams and her children (including Mary L. Pugh nominally) commenced a suit in the Maury county chancery court against John W. Frierson, as administrator with the will annexed of Ellen K. Mayes, and in his own right and that of his wife, Mary Gentry Frierson, and John Williams. The bill in that case contained averments similar to those of the bill in the instant suit (that is, the facts there alleged were the same in substance as those hereinbefore set forth), and, except as to lot 7, the relief prayed

there was in effect the same as that sought here. The defendants in that suit filed an answer and cross-bill setting out the substance of the defenses made in the present suit, and praying that plaintiffs be made defendants to the cross-bill. To this the plaintiffs, including Mary L. Pugh by name, made answer, which was sworn to by all except Mrs. Pugh. An exception to this omission was sustained, and an order entered to that effect, which, however, contained a recital that publication had been "made according to law for Mary L. Pugh," that she had failed to make defense to the cross-bill, and adjudged that its allegations be taken as confessed by her. On the same day the plaintiffs in that suit filed an amended and supplemental bill in which Mary L. Pugh was named as a defendant, and not as one of the plaintiffs, and the prayer included a request that publication be made as to her, and a statement that relief was not asked in her behalf. The cause was referred to a master, with direction to state amounts due Maria L. Williams and her daughter, Cornelia Winder, from the estate of Ellen K. Mayes as follows: On account of sale of lot 5, on account of shares in the estate of Francis McGuire, and on account of collections made by Ellen K. Mayes as administratrix of his estate. The master found in favor of Mrs. Williams and her daughter, Cornelia Winder, in specific amounts, and "called attention to the fact that Mrs. Pugh, one of the daughters of Mrs. Williams, seeks no relief in these proceedings." The chancellor, on May 5, 1893, entered a decree sustaining in material parts the findings of the master and allowing the defendants an appeal to the Supreme Court of Tennessee. On December 4, 1893, the Supreme Court reversed the decree of the chancellor and dismissed the bill of plaintiffs and the cross-bill of defendants; and the present defendants plead the decree of the Supreme Court in that case in bar of the present suit.

4. *Genealogy of Certain of the Parties—Dates of Deaths—Possession of Property.*—Confusion may be avoided by remembering the following facts: The plaintiffs and the infant defendants in the instant case are descendants, respectively, of Maria L. Williams and Ellen K. Mayes, who were daughters of Patrick McGuire and sisters of Francis McGuire. Mary L. Pugh was the daughter of Maria L. Williams and the mother of the plaintiffs bearing her name and of Mrs. Ellen McConnachie. The only child, a daughter, of Ellen K. Mayes, died before her mother, leaving only one child, Mary Gentry Frierson. Mrs. Frierson survived her grandmother, Mrs. Mayes, but died before commencement of the present suit, leaving surviving her the three infant defendants. Mary L. Pugh died in 1906, and her mother, Maria L. Williams, in 1907, and Ellen K. Mayes died in the early part of 1890. The infant defendants in the present suit are, through their tenant, the defendant Phœnix National Bank, in possession of lot 5, and, through defendant James, their tenant, in possession of lot 7.

By the first decree entered in the instant case, the bill was dismissed. Upon rehearing, however, the decree was so modified as to dismiss the portion relating to lot 7, without prejudice, and on the ground that as to this lot plaintiffs have a complete and adequate remedy at law. Plaintiffs appeal from the entire decree.

G. T. Hughes, of Columbia, Tenn., for appellants.
W. S. Fleming, of Columbia, Tenn., for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge (after stating the facts as above).
[1] The decree below, except as to lot 7, is in effect founded on the decision of the Supreme Court of Tennessee in the suit commenced October 1, 1890, and the foregoing statement is necessary to a right understanding of that case. The case is not reported; and the reasons for the conclusion there reached appear in the decree, which was enter-

ed December 4, 1893, and is set forth in the margin.[2] The decree states "that all proper and necessary parties were before the court." This is seriously contested by counsel; and, under the facts of the present record, the determinative issue hinges upon the question so made. Admittedly the present plaintiffs were not parties to that suit, or to any of the proceedings or instruments upon which it was based; and the contention is that in view of their relations to the wills involved they could not be bound by the decree, nor by the deed conveying lot 7. The learned trial judge believed that the plaintiffs "must be deemed to have been before the court by virtue of representation and to be now bound on the principles of such representation." This is upon the theory that the present plaintiffs were represented by their grandmother, Maria L. Williams, the life tenant; also by their mother, Mary L. Pugh,[3] and, as we understand, by her sister and her two brothers. This not only limits the representatives to the life tenant and her immediate children, but treats the daughters and sons alike as holding a vested estate of inheritance under the will of Patrick McGuire, and the two daughters as holding a similar estate under the will of Francis McGuire.

The doctrine of virtual representation is settled, and if applicable here the decree below must be affirmed. The relevancy of this doctrine must depend upon the true intent of certain portions of the wills of Patrick McGuire and Francis McGuire, and whether it was necessary to resort to the doctrine in the suits disposing of the Williams property. Concededly, Maria L. Williams and Ellen K. Mayes, daugh-

[2] "This cause came on this day to be heard before the honorable Supreme Court at Nashville, upon the transcript of the record from the chancery court of Maury county, briefs, and argument of counsel, from all of which it appearing to the court that there was no merit in complainant's bill, that there is no evidence to show that Mrs. E. K. Mayes collected any funds as administratrix of Francis McGuire in Tennessee, and no evidence that she brought any funds belonging to said estate from the state of Mississippi to the state of Tennessee, no fraud shown or alleged in obtaining the decrees set aside by the chancellor, and no fraud or undue advantage shown in the family settlement in 1867, that said transaction was fair and the parties had a right to make it, that this was a family settlement made some 25 years ago, and ratified by the court, that all proper and necessary parties were before the court, that R. B. Mayes, John Frierson, Frank McGuire, and Mrs. Ellen Mayes are dead, and that now, after long acquiescence in all these decrees and this settlement, complainants seek to reopen all of these matters, of which Mrs. Maria L. Williams and her husband got the benefit, and it further appearing to the court that the bill can not be maintained as a bill of review, because not filed within 3 years after the decrees were made, nor as a bill to impeach a decree from fraud, for want of proper allegations, and the court being of opinion that the demand is old, stale, and inequitable, and that the courts will uphold these family settlements after long lapse of time, when the parties and witnesses are dead, and no gross fraud or great injustice shown. The court is therefore of opinion, from the whole record, that this suit should not be maintained, and that the complainants, on account of long acquiescence, should be left where their own great laches find them, and that the decree of the chancellor is erroneous. It is therefore ordered, adjudged, and decreed by the court that the decree of the chancellor be reversed, the bill of complainants and the cross-bill of defendants be dismissed. * * *"

[3] For the purposes of this case, we shall treat Mrs. Pugh as having been a party to the suit begun October 1, 1890.

ters of Patrick McGuire and sisters of Francis McGuire, received estates only for their natural lives under those wills. The difficulty arises under the provisions of the wills which immediately follow the portions vesting such life interests.[4] The part of Patrick McGuire's will of present application is in the fourteenth clause:

"And at the death of my said daughters * * * the share of said property, and the increase of the same belonging to each, to be equally divided amongst their children then living, or the issue of any which may have died before their parents (their mothers)."

The language of Francis McGuire's will which is here pertinent, reads as follows:

"On the decease of my said sisters then the portion each takes shall go to the female child or children each may have at the time of her death, share and share alike. * * * In case my said sisters should have daughters married during the lifetime of their mothers and should die before her mother, leaving children, and these children or any of them should be alive at the decease of my sisters respectively, the children shall be entitled to the same share the mother would be entitled to if then alive."

It will be observed that under both of these wills the life tenants were to be succeeded by lines of remaindermen who were described by classes, not by names. It is also to be noticed under the first will that it was not until the *death* of a daughter of the testator that the share of property embraced in her life estate was "to be equally divided," and that this distribution was to be made among her "children *then living,*" including the issue of any of her predeceased children; and this is true in substance and effect under the corresponding provision of the second will. In other words, since the time fixed for distribution of each of the shares among remaindermen was dependent upon a future event, and the remaindermen under each will were subject to fluctuation in numbers by births and deaths, it would seem reasonably plain that, under what is known in Tennessee as the "class doctrine," the entire interest in the share and the right to control its destiny could vest only in such surviving remaindermen as at the time of the death of the life tenant fell within the class described in the will. This class doctrine is of long standing, and has been applied regardless of the nature of the property bequeathed or devised. The rule stated in Satterfield v. Mayes (decided in 1850) 11 Humph. (Tenn.) 58, 59, 60, is still accepted as the true definition of the doctrine:

"The rule is well settled that, where a bequest is made to a class of persons subject to fluctuation by increase or diminution of its number, in consequence of future births or deaths, and the time of payment or distribution of the fund is fixed at a subsequent period, or on the happening of a future event; the entire interest vests in such persons only as, at that time, fall within the description of persons constituting such class. * * * Members of the class antecedently dying are not actual objects of the gift. * * * This rule, of course, does not apply where the bequest is to individuals nominatim as in the case of a gift to A., B., and C., children, or brothers, of D., because it would not be a gift to them as a class."

The subject of the bequest involved in that case, a negro girl, was given to the testator's daughter during her natural life, and, after her

---

[4] See portions set out in the statement.

death, the negro girl and "her increase" were "to be equally divided" between the life tenant's daughters.

In Beasley v. Jenkins, 2 Head (Tenn.) 191, it appeared that the testator had by the fifth item of his will given the residue of his lands to his brother Hiram "during his natural life," and directed that upon the brother's death all the lands should be sold and the proceeds "equally divided between all my brothers' and sisters' children," and by the sixth item directed his "executors to sell, *immediately,* his house and lot in the town of Murfreesboro" and certain personalty, "and divide the money equally amongst my brothers' and sisters' children, as soon as possible." The language employed in the fifth item to describe the remaindermen was the same as that used to describe the beneficiaries under the sixth item. Twenty years elapsed between the death of the testator and that of the life tenant named in the fifth item. It was urged that the persons who took under the sixth item should take the remainder interest under the fifth, although the persons taking under the sixth immediately upon the death of the testator were materially different from those answering to the class 20 years later under the fifth item. It was sought to exclude the rule in Satterfield's Case, but the court held (2 Head [Tenn.] 193):

"This construction cannot prevail. The rule governs both classes alike. The fund created by each vests in the described class, as a class, as it exists at the time fixed for distribution of the fund."

In Nichols v. Guthrie, 109 Tenn. 535, 73 S. W. 109, the testator had devised land to his granddaughter during her natural life—

"* * * to be free from the debts, liabilities, or contracts of her present * * * husband, and at her death all of said property is to be equally divided among the children of said Elizabeth then living, or the descendants of such children."

During the life tenancy a judgment creditor of Walter Sims, a son of the life tenant, caused execution to be levied upon "his interest in the land," and subsequently purchased it at sheriff's sale. After the levy, but before the sale, the son conveyed his interest to his sister, who subsequently conveyed to complainant, Nichols. It is to be inferred from the decision that the son survived his mother, the life tenant; and, upon an issue growing out of these transactions, it was held that the rule in Satterfield's Case applied, and that the execution purchaser took nothing by his purchase (109 Tenn. 542, 73 S. W. 107)—

"while complainant Nichols, as alienee, if upon no other ground, upon that of estoppel, did acquire the interest of Walter Sims when it fell in upon the death of the life tenant."

In Sanders v. Byrom, 112 Tenn. 472, 79 S. W. 1028, the class doctrine was applied to a trust created by deed. The property was conveyed to E. A. Ikard in trust for the grantor's daughter Virginia Stovall—

"for and during her natural life, and at her death to her children forever; * * * that is to say, for the sole and separate use and benefit of my daughter, Virginia, during her natural life, and at her death to go to her children forever."

The daughter became the wife of defendant, Byrom, and had four children. One of these intermarried with one Simpson, and died intestate before the death of her mother (the life tenant), leaving complainant, wife of one Sanders, as her only heir at law; and it was alleged in the bill of complainant that she was entitled in the right of her mother, Mrs. Simpson, to one-fourth of the trust estate. This claim failed upon demurrer to the bill. The question determined in the Supreme Court was (112 Tenn. 475, 476, 477, 79 S. W. 1029) "whether the provision copied from the deed falls within what is known in this state as the 'class doctrine.'" In the course of the opinion the cases supporting that doctrine from the year 1835 to 1902 are collated, and the cases stating exceptions to the rule between 1848 and 1901 are cited. Following the rule laid down in the Satterfield Case, it was said:

"It.is observed that there are three elements in the rule: One is that there must be a class of persons subject to fluctuation by increase or diminution of its number; second, that the bequest must be to the class; and, third, that the time of payment or distribution must be fixed at a subsequent period."

Application of the rule was again made as late as 1912, in Tate v. Tate, 126 Tenn. 169, 148 S. W. 1042. The testatrix, Mrs. Hillsman, died leaving her husband and two daughters surviving her, and giving her entire estate to her husband, in trust, for his own use during his natural life—

"and at his death to be equally divided between my children, share and share alike, and in fee, the issue of any child that may have died to represent and take the share of the deceased parent."

For the purpose of removing incumbrances from the land, and also of reinvestment, the trustee was given power of sale, which, however, was to be exercised only with the consent of B. M. Estes. One of the daughters, who never married, died before the life tenant, her father. Upon his death, Mrs. Tate was the only surviving child, and no issue was left by any deceased child. The suit grew out of certain trust deeds, particularly one known as the Clark deed, which were executed, by the life tenant and his unmarried daughter, to secure loans obtained for the most part to pay taxes due on the estate, and which seem to have accrued partly before and partly after the death of the testatrix (126 Tenn. 199, 200, 208, 148 S. W. 1050, 1052). It was insisted upon various grounds, among which was a claim of estoppel, that these transactions were binding upon the complainant, Mrs. Tate; but it was in substance held that the will was governed by the class doctrine, and that, since the unmarried daughter had joined the life tenant in executing the deeds of trust and died prior to his decease, her conveyances were inoperative. However, as some of the moneys borrowed were used to remove tax incumbrances, they were made a charge upon the land. The decisions establishing the class doctrine were reviewed at great length in that case by Mr. Justice Neil, who had previously considered them so fully in Sanders v. Byrom, supra.

[2] It should be added that under this doctrine the class of remaindermen described will include the issue of predeceased members, wherever such inclusion appears to have been fairly within the in-

tent of the testator. Tate v. Tate, supra, 126 Tenn. at pages 180 to 182, 148 S. W. at page 1042, and citations; Beasley v. Jenkins, supra, 2 Head (Tenn.) at 193; Ford v. Hurt, 127 Tenn. 557, 559, 155 S. W. 927. Another feature to be noted of the class doctrine is that it differs from the general rule concerning the vesting of estates. This is pointed out in a number of decisions in Tennessee, beginning with the Satterfield Case and reannounced in Sanders v. Byrom, where it is said (112 Tenn. 482, 79 S. W. 1031):

> "The authorities of this state are clear that, where the facts of a case bring it within the class doctrine, the case must be controlled by that doctrine, and not by the common-law rule. Under the class doctrine 'the estate vests in the described class as a class, and not individually in the persons composing such class, and the entire subject of the gift survives to and vests in the persons constituting such class at the period when payment or distribution of the fund is to be made.' Satterfield v. Mayes, 11 Humph. 60."

[3, 4] It is hardly necessary to say that a uniform rule of construction such as this should be followed by the courts of the United States, since it has evidently become a settled rule of property in Tennessee (Barber v. Pittsburgh, etc., Railway, 166 U. S. 83, 99, 17 Sup. Ct. 488, 41 L. Ed. 925, and citations); and in our judgment the facts of the instant case bring it within the class doctrine. In applying the doctrine to the transactions complained of, it is to be borne in mind that the mother of plaintiffs, Mary L. Pugh, died before her mother, Maria L. Williams, who was a life tenant under both of the wills, and that according to the express terms of each will the plaintiffs, upon the death of their mother, succeeded jointly to rights like those of the class of remaindermen first described in each will, and so stood in that relationship at the death of the life tenant, and these rights were derived from the testators through their wills, and not from plaintiffs' mother. The death of the life tenant was fixed by each of the testators as the time for distributing the property bestowed upon Mrs. Williams for her natural life. How, then, in view of the class doctrine, could these plaintiffs be rightfully deprived of the normal portions of the estates they would have received if no diversion had taken place? While the life tenant could dispose of her life interest, she had no right to transfer the body of the property in either of the estates, and so of the mother, in whom no transferable right ever vested; and, for reasons equally manifest, this is true of Mrs. Pugh's sister and brothers during the life of their mother (the life tenant). It may be conceded that, if Mrs. Pugh had survived the life tenant, she might in consequence of the facts pointed out in the statement have been foreclosed by estoppel in the present case; but that would have been because of her right then to possess and enjoy a distributive share of the property. Indeed, the most that can be said of her acts is that those seeking benefits from them secured only the chance that she might survive her mother, the life tenant (Nichols v. Guthrie, supra); and surely any rule of estoppel that might be invoked against Mrs. Pugh's sister and brothers, who not only survived her, but also their mother, must be of a personal character, and so cannot be available to destroy rights they never possessed, such as those of the present plaintiffs. It must be constantly remembered that "the entire sub-

ject of the gift survives to and vests in the persons constituting such class at the period when payment or distribution is to be made."

[5] Is this class rule, then, to be avoided by the doctrine of virtual representation? That doctrine, as the court said in McArthur v. Scott, 113 U. S. 340, 404, 5 Sup. Ct. 675, 28 L. Ed. 1015, was "adopted by courts of equity on considerations of sound policy and practical necessity." Mr. Justice Gray there pointed out (113 U. S. 400 et seq., 5 Sup. Ct. 652, 28 L. Ed. 1015) a number of examples of application of the doctrine such as in cases of partition, where division is made in kind, or where changes of investment are deemed advisable which leave undiminished the interests of the parties in the property in its new form, or where creditors are entitled to present payment, no matter who may become the future owner of the estate. It is manifest that a more serious question arises when it comes to treat such a person's title as absolutely divested and as transferred to another, in spite of the apparent contrary intent of the testator; and, although recognizing the rule laid down by Lord Redesdale in Giffard v. Hort, 1 Sch. & Lef. 386, 408, "that where all the parties are brought before the court that can be brought before it, and the court acts on the property according to the rights that appear, without fraud, its decision must of necessity be final and conclusive," yet Mr. Justice Gray (in McArthur v. Scott, 113 U. S. at page 402, 5 Sup. Ct. at page 652, 28 L. Ed. 1015) in substance said the only reason for that rule was the necessity of the case; and so the rule of virtual representation was not applied in McArthur v. Scott, for, since the interests of complainants in that case came through the will of their grandfather, Gen. McArthur, and were executory and supported by a legal trust estate in the executors, who had resigned and whose places had not been filled, it was held that complainants had not been represented in the earlier suit wherein the will had been set aside. It is true that complainants, grandchildren of the testator, were born after the will was set aside; but it is also true that grandchildren of the testator were in being and through guardians ad litem were parties to that suit. This, however, was not enough. The true interests of complainants could be represented only by the executors, and their places might have been filled by others who could have been made parties to the suit.

The District Judge regarded the present case as distinguishable from McArthur v. Scott, and as controlled by Miller v. Texas & Pac. Railway, 132 U. S. 662, 10 Sup. Ct. 206, 33 L. Ed. 487. The title to the land involved in Miller v. Texas & Pac. Railway was sustained in both that case and Miller v. Foster, 76 Tex. 479, 13 S. W. 529; and so far as now important this title is traceable in both of these cases to a decree setting aside the will of Thomas P. Rutledge, bearing date June 7, 1848. Rutledge devised the land: First, to his wife, for 21 years after his death; second, at the expiration of that period, to their children; third, in the event of the wife's death without a child of theirs surviving, to the children of one Miller; fourth, in the event of the death of the children born to testator and his wife, to her for her life. The testator died in 1850, leaving his widow and an infant

son surviving him. The will was thereupon proved by Miller, the executor, whose children were the ultimate devisees in remainder named in the will. The widow of the testator married a Mr. Foster, and, with her husband, brought suit against Miller, the executor, and the son of the testator, Rutledge, to have his will declared null and void, claiming that the testator's land was community property and that the disposition made of it by the will was contrary to law, etc. The executor answered, admitting the allegations of the petition and not opposing its prayer, while the infant filed answer by guardian ad litem, submitting the matter to the discretion of the court. The decree entered in 1852 set aside the will and adjudged that Mrs. Foster and her infant son (Rutledge) be "entitled to take, have, and hold all the property of said deceased jointly between them as heirs at law." The testator's son died in 1854 at six years of age; and his mother, Mrs. Foster, died in 1881. Several years later the two cases before cited were commenced (132 U. S. 662, 10 Sup. Ct. 206, 33 L. Ed. 487, and 76 Tex. 479, 13 S. W. 529), and in each of them the decree setting aside the Rutleuge will was adjudged valid as against Miller's children, in whose favor the devise over had been made. In the Miller-Railway decision (132 U. S. at pages 671, 672, 10 Sup. Ct. at page 206, 33 L. Ed. 487) the McArthur Case was distinguished, on the grounds: (a) The executor of Rutledge had been made a party to the suit contesting his will, while the executors of McArthur had not in the will contest occurring there; (b) the decree avoiding the Rutledge will could not be attacked collaterally; and (c) the entire Rutledge estate was represented before the court—a particular estate in the widow, and the fee simple remainder in the infant son, while the interest of the Miller children as devisees under the will "was a mere contingent interest, a mere executory devise"—the court following the rule declared by Lord Redesdale in Giffard v. Hort, which rule was commented upon and recognized in McArthur v. Scott as before stated. It does not seem to us, however, that the decision in the Miller-Railway Case is decisive of the instant case.

Concededly the children of Miller were represented by the executor of Rutledge in the suit in which the Rutledge will was set aside, and it is therefore plain enough that they would not be heard in a collateral attack upon the decree annulling the will. However, since no suit was ever commenced to set aside either of the wills here involved, the present plaintiffs cannot be precluded upon that theory of the Miller Case. It is true that Frierson, as administrator with the will annexed of Patrick McGuire, was one of the plaintiffs in the suit brought in the chancery court of Maury county, Tenn., to partition the storeroom property of the testator, and that it was in this suit that the Williams undivided one-half of lot 5 (derived through the will of Francis McGuire) was, under sanction of the court, set apart to Ellen K. Mayes for life, and then to her children, according to the provision of her father's will, and in partial satisfaction of indebtedness of John Williams (husband of Maria L. Williams) to the estate of R. B. Mayes (husband of Ellen K. Mayes); but no legal representative, such as executor or administrator, of the estate of

Patrick McGuire, was a party to any other suit in which any of the property, real or personal, embraced in the life estate of Maria L. Williams, was transferred to Ellen K. Mayes. Further, no legal representative of the estate of Francis McGuire was a party to any suit in which such a transfer was made. We may therefore safely eliminate the controlling effect, as it is claimed, of the Miller-Railway Case, so far as the theory that the will of either of the McGuires was represented in any of these proceedings (Miller v. Railway, 132 U. S. at 671, 10 Sup. Ct. at page 206, 33 L. Ed. 487); for, although the proceedings sanctioning the transfer of the Williams undivided portion of lot 5 to Mrs. Mayes were entered in the partition suit, lot 5 in effect came from the estate of Francis, and not that of Patrick, McGuire.

The sole basis, then, of the claim of virtual representation, is that it was competent for Maria L. Williams, a life tenant, and her children, in the earlier suits pointed out, to represent the rights of the present plaintiffs in the corpus of the estates of the two McGuires, which was covered by the Williams life interests, and, further, that such virtual representation was effective to transfer those rights in discharge of indebtedness of the husband of the life tenant and in the teeth of express inhibitions of the wills of the testators. By the will of Patrick McGuire the life estates were given to his daughters "for their sole and separate use and benefit; and the use and benefit of such child or children as they now have, or may hereafter have, * * * to be held by them free from the debts * * * of their present, or any future husbands which they may have," and by the will of Francis McGuire the life estates were given to his sisters for "their sole and separate use, in which their husbands respectively shall have no right or interest." It is not difficult to discern and appreciate the motives that actuated such a perversion as this amounts to, though it is not too much to say that it was violative, not only of the wills, but also of the origin and intent of the doctrine of virtual representation. This latter feature is shown in connection with the severe criticisms made by Lord Redesdale in Giffard v. Hort, and the delays he there imposed to enable the parties affected to avoid application of the rule where its operation was manifestly harsh and unjust; and while this may be said to accentuate the certainty and possible effect of the rule, still it abundantly appears in the decision in McArthur v. Scott, 113 U. S. 402, 5 Sup. Ct. 652, 28 L. Ed. 1015, that the rule will not be applied where the representation relied on does not appear to have been either real or necessary.

To say the least of the application of the rule here, it was not necessary (when transposing to Mrs. Mayes the property covered by the Williams life interest) to resort to representation of the present plaintiffs through the life tenant and her immediate children, for at least three of the present plaintiffs, children of Mrs. Pugh, were in being before the decree of 1878 was entered approving the settlement of the estate of Patrick McGuire, and all the Pugh children were in being when the suit of 1890 was commenced and finally decided by the Supreme Court of Tennessee, and since the purpose was to dispose of,

not to preserve in specie or in any other form, the body of the property affected by the life interests of Maria L. Williams, we do not see why the plaintiffs as they came into being were not necessary parties to the proceedings. True, they were grandchildren of Mrs. Williams; but a grandchild of Mrs. Mayes—Mary Gentry Frierson— was a party to the second partition proceeding and also the suit of 1890. It is not claimed, however, that virtual representation can be ascribed to her, for her interest throughout was directly opposed to the interests of the present plaintiffs; indeed, Mrs. Mayes was dead when the suit of 1890 was begun. Upon the whole, it is impossible, under the present record, to escape the belief that, throughout the cases and the proceedings had therein which are now urged in bar of the present suit, these plaintiffs and their interests were ignored; indeed, as we understand the records of those cases, even the existence of these plaintiffs was not revealed to the courts of Tennessee.

There is to be added the effect of the class doctrine. According to that doctrine, no estate of inheritance ever vested in Mary L. Pugh individually. The estate under each will vested in a class, as a class, there described. The class provided by Patrick McGuire's will in terms extended, not only to children of Mrs. Williams and Mrs. Mayes, but also to children of Susan B. Preston (formerly McGuire) and Betty Sanford (formerly Looney); but whether children were born to and survived Mrs. Preston and Mrs. Sanford does not appear. However this may be, as we have seen, the entire subject-matter of each bequest and devise was, under the class doctrine, to survive to and vest in the persons constituting each class at the time fixed for ultimate division of the corpus of each estate, and that doctrine had been declared in Tennessee years before the execution of either of these wills. When the wills were probated, every person dealing with the property so bestowed was, of course, chargeable with notice of the provisions of the wills as well as of the existence of the class doctrine—certainly beneficiaries thereunder were chargeable with such notice. When it is sought, then, to apply the doctrine of virtual representation to property limited and restricted as the properties were under these wills, still further considerations enter into the problem. The persons who are said to have represented the interests of the present plaintiffs in the suit begun October 1, 1890, were the very persons who attempted to dispose of those interests in the transactions which were consummated in 1878. During the latter transactions, Mrs. Pugh's interests in her parents and in her children, as indicated by her acts, distinctly conflicted. Similar conflicts of interests seemingly extended to Mrs. Pugh's sister and brothers concerning their children; and the interests of the life tenant, opposed to those of the present plaintiffs, are apparent. The effect of these conflicting interests is emphasized by the fact, clearly to be inferred from the record, that all concerned were totally indifferent to the consequences that might come to the grandchildren of the life tenant, as they have in fact come to Mrs. Pugh's children.

Now, how could those persons rightfully represent plaintiffs in the suit of October 1, 1890? They were then seeking, in repudiation of their previous acts, to recover what they had diverted to Mrs. Mayes.

They were obviously open to the consequences of their own conduct. It was not necessary so to represent Mrs. Pugh's children. They might have been made parties. We do not know of any rule which would require the doctrine of virtual representation to be carried to such an extent in circumstances like these. Above all, when the property was turned over to Mrs. Mayes, the object was to enable the life tenant to discharge the debts of her husband; and all these theoretic representatives were without right or authority, for that purpose, to destroy the normal operation and effect of the class rule upon the property in question.

Our attention has not been called to any decision in Tennessee which passes upon the question whether the doctrine of virtual representation will apply to a situation like this; but we cannot believe that a settled rule like that of the class doctrine can be broken down in the manner attempted here. However, if we are wrong in this, we do not think that either the present plaintiffs or their interests were in reality represented in the proceedings here set up in bar of their right of recovery; and we find no decision justifying a different conclusion. Applying the language of Mr. Justice Gray in McArthur v. Scott, 113 U. S. 404, 5 Sup. Ct. 675, 28 L. Ed. 1015:

"To extend the doctrine of constructive and virtual representation, adopted by courts of equity on considerations of sound policy and practical necessity," to a case like this, "in which it is apparent that there was no real representation of the interests of these plaintiffs, would be to confess that the court is powerless to do justice to suitors who have never before had a hearing."

[6] It remains briefly to consider the defenses made under certain statutes of limitation of Tennessee, to wit, two of them each prescribing ten years, one seven, and the other three years, and the contention that the plaintiffs are guilty of laches. The plaintiffs' mother, Mary L. Pugh, died in February 1906, and the life tenant (her mother), Maria L. Williams, died July 20, 1907, and the instant suit was commenced August 10, 1908. Thus there elapsed after the death of Mrs. Pugh, 2 years and 6 months, and after the death of Mrs. Williams, less than 13 months, before the present suit was brought; in other words, plaintiffs took action well within the shortest period prescribed by any of these statutes. The life estates of Mrs. Williams prevented the plaintiffs from maintaining an action to recover any of the property in dispute. In McCorry v. King's Heirs, 3 Humph. (Tenn.) 267, 275 (39 Am. Dec. 165) it was held:

"A remainderman or reversioner has no right or power to bring an action. He is not excused therefrom, for he cannot do it at all. His omission of it is no neglect; his postponement of it is no laches. His right to an action has not yet accrued. He cannot during the time of the tenant for life lose his estate or be barred of his right by the fault or wrong, neglect or laches, of the owner of the particular estate."

See, also, Teague v. Sowder, 121 Tenn. 132, 152, 114 S. W. 484; Jackson v. Schoonmaker, 4 Johns. (N. Y.) 390, 402; Hanson v. Ingwaldson, 77 Minn. 533, 538, 80 N. W. 702, 77 Am. St. Rep. 692; Pryor v. Winter, 147 Cal. 554, 557, 82 Pac. 202, 109 Am. St. Rep. 162; Smith v. McWhorter, 123 Ga. 287, 292, 51 S. E. 474, 107 Am. St. Rep. 85; Allen v. De Groodt, 98 Mo. 159, 163, 11 S. W. 240, and note thereto,

tit. "Reversioners and Remainderman," 14 Am. St. Rep. at pp. 628, 634, 635, 637, and citations; and further, on the subject of laches, see Parker v. Bethel Hotel Co., 96 Tenn. 252, 285–287, 34 S. W. 209, 31 L. R. A. 706.

It is clear that the plaintiffs could not have instituted suit to recover any of the property during the life of Mrs. Williams, except upon the theory either that her life estate had passed or that it had not passed in virtue of the proceedings under review here; and no matter which view might have prevailed, the plaintiffs would have failed, either because of the life estate in Mrs. Williams or of its transfer to Mrs. Mayes, defendants' predecessor in title (Polk v. Gunther, 107 Tenn. 16, 20, 64 S. W. 25); for it scarcely need be said that plaintiffs would have been remaindermen, whether they had commenced suit before or after the death of their mother, prior to the death of the life tenant.

As to the relief plaintiffs are entitled to, we hold that the deed purporting to convey lot 7 was inoperative, and is invalid and void as against the interests of these plaintiffs. And while this court has no jurisdiction to grant the prayer of the bill to vacate or set aside any of the decrees of the state courts pleaded in bar of recovery here, yet plaintiffs are entitled as against the defendants to recover their (plaintiffs') proportionate share in the property, both real and personal, which was embraced in the life estates of Maria L. Williams, since plaintiffs' title thereto under the wills of Patrick McGuire and Francis McGuire remains unimpaired (McArthur v. Scott, 113 U. S. at page 405, 5 Sup. Ct. at page 652, 28 L. Ed. 1015); but, apart from such proportionate share in the undivided one-half of lot 5 and in the whole of lot 7, the amount of recovery, including rents and profits derived from the realty, cannot be definitely settled here.

The decree below is reversed, with costs, and the cause is remanded for further proceedings not inconsistent with this opinion.